United States Court of Appeals,

Fifth Circuit.

No. 91–8020.

Fred G. BROWN, d/b/a National Parakleen Co., Plaintiff–Appellee,

and

Micro–Bac International, Inc., Plaintiff–Appellee, Cross–Appellant,

v.

PETROLITE CORPORATION, Defendant–Appellant, Cross–Appellee.

July 13, 1992.

Appeals from the United States District Court For the Western District of Texas.

Before DAVIS, JONES and EMILIO M. GARZA, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellant Petrolite Corporation appeals from a final judgment entered on a jury verdict, awarding Fred G. Brown, d/b/a National Parakleen Company ("Brown") and Micro–Bac International, Inc. ("Micro–Bac") (sometimes collectively "the appellees") actual and exemplary damages for Petrolite's tortious conduct. Petrolite contends that the evidence at trial was insufficient to support the jury's findings of liability and that the district judge committed several errors that require a reversal. In addition, Micro–Bac cross-appeals the district court's refusal to allow post-judgment interest on the jury's award of exemplary damages. We affirm in part, vacate and reverse in part, and remand.

I.

Since the earliest days of the oil industry, operators have confronted the production problems presented by the accumulation of paraffin in oil wells. Traditionally, oil producers have treated wells with hot oil or chemical solvents to eliminate paraffin build-up from drilling equipment. In extreme cases, operators often must remove their equipment and scrape off the paraffin. Appellant Petrolite is the nation's largest supplier of oil field chemicals and services and, in fact, founded the industry

seventy years ago.

In the mid–1980's, however, appellee Micro–Bac developed an alternative method for purging paraffin from oil wells. Micro–Bac, a small, new technology company, isolated a bacteria that it believed broke down the paraffin in the oil. Two years later, Micro–Bac began manufacturing and marketing bacterial products, known as Para–Bac, for use in controlling paraffin, scale, and corrosion in oil wells. Micro–Bac markets its products through independent distributors, such as appellee Brown, who buy the products from Micro–Bac and resell them to sub-distributors and endusers.

In March 1988, Brown began a one-well pilot project for Coastal Oil & Gas Company (Coastal) in the Altamont Oil Field in Utah to test the effectiveness of Micro–Bac's bacterial products. In August 1988, Coastal's production superintendent for the Altamont Field, Lester Streeb, authorized tests of microbial bacteria in five more wells. Following these tests, Coastal decided to expand its use of the bacterial products to include all of its wells in the Altamont Field, starting by March of 1989 and adding thirty wells a month. Up until this time, Coastal had purchased Petrolite chemicals for use in its wells.

Evidently concerned by its loss of business to Brown and the "big play" the Para–Bac products were getting in the Houston, Texas area, Petrolite decided to analyze the products. In April 1989, while on Coastal's premises taking water samples, Preston Stewart, Petrolite's sales engineer for the Altamont Field, procured several samples of material that he found in barrels labelled "Para–Bac." The barrels were located in a locked treater house behind a locked fence. Stewart did not receive permission from either Brown or Coastal to take the samples.

Stewart assumed that the materials stored in the barrels were Para–Bac products and presented the samples to Petrolite's laboratory as such. In fact, Stewart was unsure what the barrels contained. At trial, Brown testified that the barrels did not contain true Para–Bac products but,

instead, contained experimental materials.

When Petrolite's laboratory tested these samples, it discovered that they were contaminated. As a result, Doug Jones, the Petrolite microbiologist performing the tests, instructed Stewart to procure another set of samples, which he did. Once again, Stewart took the samples from the same location without getting permission from Brown or Coastal.

With the new samples in hand, Jones conducted a series of tests to determine whether the products performed as claimed. Based on his test results, Jones wrote a report concluding that Micro–Bac's products did not work, contained high numbers of sulfate-reducing bacteria (SRBs),[1] caused corrosion, and were likely to result in extensive damage to wells and equipment. Petrolite employees attached two letters to the report, explaining the test results and the company's conclusions, and circulated the materials to its sales force throughout the country. In addition, Petrolite sent copies of the letters and the report to several Micro–Bac customers, including Coastal and the T.N. Berry Company in Oklahoma.

When efforts to have Petrolite retract these statements failed, Brown and Micro–Bac filed suit against Petrolite in November 1989. The suit alleged (1) libel, (2) conversion, (3) tortious interference with business relationships, (4) negligence and gross negligence, (5) commercial disparagement, and (6) antitrust violations.[2] Brown and Micro–Bac sought actual and exemplary damages and an injunction against further publication of the test results. The district court granted Petrolite's motion for directed verdict on the antitrust violations and submitted the remaining claims to the jury by special interrogatories.

---

[1]In the presence of sulfate, sulfate-reducing bacteria (SRBs) reduce the sulfate to hydrogen sulfide ($H_2S$) gas, which is toxic and can react with iron in wells, causing corrosion and the plugging of lines.

[2]Only Brown brought a claim for conversion.

The jury found in favor of Brown on each of his claims but concluded that the value of his converted property was zero. The jury also determined that Petrolite had interfered with Brown's relationship with Coastal but no other customers. The jury awarded Brown $1 in compensatory damages and $300,000 in exemplary damages. In addition, the jury returned a favorable verdict for Micro–Bac on all but its tortious interference claim. The jury awarded Micro–Bac $60,000 in compensatory damages and $700,000 in exemplary damages.[3]

Petrolite filed timely appeals against both Brown and Micro–Bac. On appeal, Petrolite argues that the jury's damage awards are unsubstantiated and excessive and that the district court erred by refusing to submit a special issue on Petrolite's defense of truth, in granting injunctive relief, and in failing to grant a new trial on newly discovered evidence. Brown and Micro–Bac also appeal the district court's refusal to award them post-judgment interest on their exemplary damages.

II.

At trial, the appellees' central charge against Petrolite was that it negligently and maliciously published its report, libeled Brown and Micro–Bac, and disparaged the Micro–Bac products. We therefore begin our analysis by focusing on the appellees' claim that Petrolite's report libeled them, which we view as the essence of this suit.[4] We must determine whether the jury verdict for Brown and Micro–Bac is proper under constitutional and Texas law governing defamation actions. In conducting this inquiry, we must decide whether the statements in Petrolite's report and accompanying letters are defamatory and, if so, whether Petrolite can be held liable for their publication.

---

[3]See Appendix for the jury's responses to the special interrogatories.

[4]Under Texas law, libel and product disparagement are similar but distinct claims, protecting different interests. *Hurlbut v. Gulf Atlantic Life Ins. Co.,* 749 S.W.2d 762, 767 (Tex.1987). Because product disparagement has more stringent requirements, including proof of special damages, we consider whether the evidence supports the appellees' libel claim, and, if so, whether recovery on that claim alone supports the verdict. *See id.*

A.

A defamation plaintiff must prove that the allegedly defamatory language is false and that the defendant's publication of the language proximately caused the plaintiff's damages. *Trevino v. Espinosa,* 718 S.W.2d 848, 851 (Tex.App.—Corpus Christi 1986, no writ) (proof of falsity required); *Reicheneder v. Skaggs Drug Ctr.,* 421 F.2d 307, 311–12 (5th Cir.1970) (publication and proximate causation required).[5] Petrolite argues that neither the report nor the letters are defamatory and that Brown and Micro–Bac have failed to prove that the statements in either are false or have caused any damages. Brown and Micro–Bac, of course, argue to the contrary. Brown and Micro–Bac contend that Petrolite's statements in the report and letters that Micro–Bac products are ineffective and likely to damage oil wells and equipment have defamed them.

In determining whether a statement is libelous, Texas law looks to the effect of the statement on the minds of "ordinary readers." *Golden Bear Distr. Sys. of Texas, Inc. v. Chase Revel, Inc.,* 708 F.2d 944, 948 (5th Cir.1983); *Hajek v. Bill Mowbray Motors, Inc.,* 645 S.W.2d 827, 832 (Tex.App.—Corpus Christi 1982), *rev'd on other grounds,* 647 S.W.2d 253 (Tex.1983). Here, the jury found that the statements in Petrolite's report were false and defamatory. We must affirm this verdict if substantial evidence supports the jury's conclusion. *Levine v. CMP Publications, Inc.,* 738 F.2d 660, 671 (5th Cir.1984). Giving the record evidence all reasonable inferences in favor of the verdict, we find that the record supports the jury's finding.

Faced with increased competition from Micro–Bac products in Utah and Texas, Petrolite

---

[5]Texas law defines libel as:

> [A] defamation expressed in written or other graphic form that tends to ... injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach a person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury.

V.T.C.A., Civil Practices & Remedies Code § 73.001. Under Texas law, a corporation may be libeled. *General Motors Acceptance Corp. v. Howard,* 487 S.W.2d 708, 712 (Tex.1972).

undertook to test Micro–Bac products to determine their effectiveness. Petrolite's laboratory tested samples received from Utah of what were claimed to be Micro–Bac products. Following its tests, Petrolite issued a report stating that it had found the products to be ineffective. Specifically, according to Petrolite, the tests indicated that the products did not degrade paraffin, as claimed, contained high numbers of SRBs, and produced significant amounts of $H_2S$. As summarized in letters attached to the report, Petrolite concluded that the products, if used, were likely to increase corrosion in wells and damage wells and their equipment.

At trial, Brown and Micro–Bac presented evidence that disputed the accuracy of the report and its conclusions. Brown testified that Petrolite's employee Stewart had, in fact, taken experimental materials from the locked treater house and not pure Micro–Bac products as Stewart told Petrolite. Stewart testified that he took the samples from barrels labelled "Para–Bac," but he admitted that he did not know for sure what was in the barrels. The jury was entitled to believe that Petrolite did not test actual Micro–Bac products as it claimed in its report.

Moreover, a number of witnesses, in addition to Brown and various Micro–Bac employees, testified that their experience with the products, *in the field,* flatly contradicted the report's conclusions. Coastal's Streeb testified that based on Coastal's test well results he had recommended a total conversion from chemicals to bacterial products. Coastal management accepted this recommendation. Daryl Hasely, the production superintendent for the T.N. Berry Company, also stated that he thought Petrolite's conclusions that Micro–Bac's products did not work in paraffin removal and, instead, caused corrosion were false. The president of an independent oil company characterized Brown's services as having produced "exceptional results." Another Micro–Bac distributor testified that his experience with and informal testing of the products revealed that they broke up hard chain paraffins, cleaned up flow lines, increased production, and reduced $H_2S$ and corrosion. Brown and Micro–Bac also presented evidence of additional successful test programs run by various oil companies. Finally, an independent testing expert, hired by Petrolite to duplicate its

tests, did not find that the products contained SRBs or produce $H_2S$.

Based on these laboratory and uncontradicted field test results, the jury was entitled to conclude that Petrolite's statements were false. We are persuaded that a reasonable reader, especially one in the oil business, could infer an untrue and damaging impression of Brown and Micro–Bac from Petrolite's statements. Therefore, examining the evidence as a whole, the record supports the jury's finding that Petrolite's report and accompanying letters defamed Brown and Petrolite.

## B.

We next consider whether Petrolite's conduct in publishing the defamatory statements is actionable. In *Gertz v. Robert Welch, Inc.,* the Supreme Court held that the states are free to define the level of liability giving rise to recovery for a private defamation victim so long as they do not impose liability without fault. 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). *See also Levine,* 738 F.2d at 671. In accordance with *Gertz,* Texas has provided that "a private individual may recover damages from a publisher or broadcaster of a defamatory falsehood as compensation for actual injury upon a showing that the publisher or broadcaster knew or should have known that the defamatory statement was false." *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 819 (Tex.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977). *See also Levine,* 738 F.2d at 672; *Golden Bear,* 708 F.2d at 947–48; *A.H. Belo Corp. v. Rayzor,* 644 S.W.2d 71, 80, 82 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.); *Houston Belt & Terminal Ry. v. Wherry,* 548 S.W.2d 743, 752 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.), *cert. denied,* 434 U.S. 962, 98 S.Ct. 497, 54 L.Ed.2d 447 (1977). Again, our review of the record reveals substantial evidence from which a reasonable jury could find that had Petrolite exercised reasonable care it would have known that the statements were false.

In the spring of 1989, Petrolite found itself competing for business with Micro–Bac, an industry newcomer, which claimed to have found a replacement for traditional chemicals. As a result,

Petrolite determined to test Micro–Bac's products. When Petrolite could not obtain samples directly from Micro–Bac, Petrolite had its employee Stewart "acquire" samples from a locked building without either Coastal's or Brown's permission. As the jury determined, despite Stewart's testimony that the barrels, from which he took the samples, were labelled Para–Bac products, Stewart could not have known exactly what the barrels contained. In fact, at trial, Stewart admitted that he simply assumed that the barrels' contents corresponded to the labels on the barrels. In addition to not knowing precisely what was in the barrels, Stewart had no idea how old the product was, an important concern when dealing with living organisms with relatively short life-spans. Stewart also did not know if the barrels had been exposed to any contaminants. Brown testified that he had been conducting experiments with these materials and had mixed them with production water and other contaminants.

When the Petrolite laboratory received Stewart's samples, Jones presumed that they were as Stewart represented them to be. Jones, who did not know what comprised the Micro–Bac products, did not determine if the samples were actually Micro–Bac products. Nevertheless, after testing the samples, Jones wrote a report stating that he had tested certain Micro–Bac products and concluding that they could be harmful to oil wells and equipment.

While Jones and Petrolite did not know precisely what they were testing, they did know that several oil companies had tested Micro–Bac successfully in the field. The success of these field tests, in part, motivated Petrolite to perform its own tests. Nonetheless, Petrolite only conducted laboratory tests and never accounted for the success of others' field tests.[6] Thus, the jury could reasonably conclude that Petrolite knew, or should have known, that the report likely contained false statements. Moreover, Petrolite must have known of the likely negative impact its report would have on Micro–Bac and its distributors. The jury was entitled to conclude that, in publishing its report,

_____

[6]Petrolite did draw and test samples from wells that Brown was treating. Petrolite, however, knew as little about the treatment of these wells as it did about the samples Stewart took.

Petrolite counted on such an impact to give it a competitive advantage.

Petrolite argues, however, that even if the statements were defamatory neither Brown nor Micro–Bac suffered any damages. We disagree. The district judge instructed the jury that if it found that "the plaintiff ha[d] established the essential elements of the offense but ha[d] failed to prove actual damages [it could] award a nominal sum such as one dollar." As we have just discussed, the jury was entitled to find that Petrolite defamed Brown. Under the court's instruction, to which Petrolite did not object, the jury was entitled to award Brown one dollar in nominal damages.

The jury was also entitled to award Micro–Bac $60,000 in compensatory damages. In determining compensatory damages, the judge instructed the jury to consider Micro–Bac's loss of reputation and business in the past and future and its need to advertise to restore its reputation. The record contains ample evidence supporting the award.

As we noted earlier, Petrolite founded the oil-field chemicals industry some seventy years ago. A number of witnesses testified to the prominent position Petrolite continues to occupy in the oil-field services industry and also to the industry's respect for Petrolite's laboratory and its work. From this testimony, the jury could infer that the issuance of a defamatory report by Petrolite would injure Micro–Bac's reputation, especially in light of Micro–Bac's tenuous position in the industry. In addition, the jury could assume that Micro–Bac would need to redouble its advertising efforts to counteract the negative and false report, which Petrolite distributed to its sales force nationwide. At trial, an advertising expert testified that the likely harm to Micro–Bac's reputation would require over $650,000 in advertising, well in excess of the jury's award.

Finally, Micro–Bac's economist testified that the negative impact of the false report would cost Micro–Bac millions of dollars in lost profits. Micro–Bac's expert explained that the company depended on its technological monopoly for its profits so that any hesitancy on the part of customers

because of the report would produce immediate, unrecoverable losses. The jury also heard the deposition testimony of Petrolite's economist, who estimated that the report could result in up to $60,000 in lost profits. Although this witness recanted his previous deposition testimony at trial, the jury was entitled to believe his earlier statements. Thus, the jury's award of compensatory damages is reasonable in light of the evidence, and we decline to disturb it.

## C.

Finding that Petrolite had acted with "actual malice" in publishing the report, the jury also awarded exemplary damages to Brown in the amount of $300,000 and $700,000 to Micro–Bac. Under constitutional and Texas law, a private defamation plaintiff must prove, by clear and convincing evidence, that the defendant acted with "actual malice" in publishing the defamatory statement to justify punitive damages. *Gertz,* 418 U.S. at 350, 94 S.Ct. at 3012; *Golden Bear,* 708 F.2d at 947; *Rayzor,* 644 S.W.2d at 84–85. In reviewing the jury's award of exemplary damages, we do not defer to the jury but, instead, must conduct an independent review of the record to determine whether it presents clear and convincing evidence of Petrolite's actual malice. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 510–11, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984); *National Ass'n of Gov't Employees v. National Fed'n of Fed. Employees,* 844 F.2d 216, 220 (5th Cir.1988); *Zerangue v. TSP Newspapers, Inc.,* 814 F.2d 1066, 1091 (5th Cir.1987). We limit this heightened review, however, to the ultimate factual finding of the constitutionally mandated actual malice element. Our inquiry does not require us to conduct a *de novo* review of the jury's determinations on preliminary factual issues or questions of credibility. See *Zerangue,* 814 F.2d at 1071; *Bartimo v. Horsemen's Benevolent and Protective Ass'n,* 771 F.2d 894, 898 (5th Cir.1985), *cert. denied,* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986).

In a series of cases, starting with *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court has developed the "actual malice" test. In *New York Times,* the Court defined actual malice as knowledge that a defamatory statement is false or reckless

disregard of a statement's truth or falsity. 376 U.S. at 279–80, 84 S.Ct. at 726. Reckless disregard means a "high degree of awareness of ... probable falsity." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). The Court has cautioned, however, that reckless disregard "cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication...." *Id.* 390 U.S. at 730, 88 S.Ct. at 1325.

In this appeal, Petrolite argues that Brown and Micro–Bac have presented no evidence that Petrolite or its employees entertained any serious doubts as to the truth of the report. *See St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325. Nonetheless, Petrolite cannot automatically insure a favorable verdict by maintaining that it published the report in good faith. *See Schiavone Constr. Co. v. Time, Inc.,* 847 F.2d 1069, 1070 (3d Cir.1988). As the First Circuit has observed, "[t]he subjective determination of whether [a defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts." *Bose Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189, 196 (1st Cir.1982), *aff'd,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). *See also Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 927 (2d Cir.1987); *Zerangue,* 814 F.2d at 1070.

Consequently, a court or jury may infer actual malice from objective circumstantial evidence, which can override a defendant's protestations of good faith. *Schiavone,* 847 F.2d at 1090; *Tavoulareas v. Piro,* 817 F.2d 762, 789 (D.C.Cir.) (en banc), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); *Bose,* 692 F.2d at 196; Oakes, *Proof of Malice in Defamation Actions: An Unsolved Dilemma,* 7 Hofstra L.Rev. 655, 666–67 (1979). "These facts should provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." *Bose,* 692 F.2d at 196. Having independently reviewed the record, we agree with the jury's finding that Petrolite acted with actual malice in defaming Brown and Micro–Bac. The record reveals that Petrolite had the motive to publish a false

report and that it acted negligently in preparing the report. More importantly, evidence in the record demonstrates that Petrolite was aware of information directly contradicting its findings but failed to explain these contrary results.

First, as we have recognized several times, competition with Micro–Bac and the fact that Petrolite was losing business to Micro–Bac compelled Petrolite to test Micro–Bac products to develop a strategy for responding to their success. Second, Petrolite surreptitiously procured samples of materials it presumed to be Micro–Bac products without verifying the samples' identity. Petrolite later reported that it had tested certain Micro–Bac products even though it never had determined exactly what products it had acquired.

Third, in conducting experiments on the samples, Petrolite and its employees disregarded their ignorance of the nature of the samples and the effect of various unknowns on their results. Petrolite biologists, including Jones who conducted the tests, admitted that it would be important to know how the products had been shipped to them, how old the bacteria were, and whether the products contained proper nutrients. Nevertheless, Petrolite never ascertained any of this information. Jones also testified that the introduction of production water or other contaminants could have influenced the results of his tests. Again, Petrolite did not, and could not, know under what conditions the products, from which the samples were taken, had existed since their production.

Fourth, Jones's conclusions appear to overstate his findings. For example, Jones testified (contrary to his report) that his results did not prove that the Micro–Bac products worsened paraffin build-up but, instead, indicated that they broke down small-chain paraffin as Micro–Bac's literature claimed. In addition, Jones's report disregarded the fact that some of the Micro–Bac samples contained no more $H_2S$ than Jones's control groups. No other scientists, or any other employees, at Petrolite reviewed Jones's test procedures or attempted to verify the accuracy of his findings or conclusions. Moreover, Petrolite never conducted any field tests to support its laboratory findings.

Finally, as early as 1987, senior Petrolite officials knew that Texaco had run successful tests with Micro–Bac products, which in many cases had doubled production. The summary deposition testimony of a senior group leader at Petrolite, which was read into the record, revealed that:

> Although Mr. Horstmann wrote in his own handwriting that Texaco was impressed of the fact that impressive results had been made by using the bugs from Parakleen manufacturer in Austin, Texas, *he testified they ignored additional research except for the samples brought in.*

Tr. at 401 (emphasis added). Petrolite also must have known that Coastal was having success with the bacterial pro ducts because otherwise Coastal would not have decided to replace Petrolite chemicals with Micro–Bac products. Nevertheless, neither the Petrolite report nor the two letters explaining its conclusions mention that the Micro–Bac products had proved effective in the field.

From these facts, the record clearly and convincingly supports the jury's conclusion that Petrolite recklessly disregarded the falsity of its statements and, as a result, acted with actual malice. A defendant's failure to investigate does not inherently establish bad faith, *St. Amant,* 390 U.S. at 733, 88 S.Ct. at 1326. Nevertheless, as we have previously recognized,

> the courts have upheld findings of actual malice when a defendant failed to investigate a story weakened by inherent improbability, internal inconsistency, or apparently reliable contrary information. A verdict for the plaintiff has been upheld when a reporter's own notes showed that she was aware of facts contradicting her story. Similarly, plaintiffs have prevailed after demonstrating that the author of a story knew facts disproving it.

*Zerangue,* 814 F.2d at 1070 (citations om itted). See also *Schiavone,* 847 F.2d at 1090; *Babb v. Minder,* 806 F.2d 749 (7th Cir.1986); *Golden Bear,* 708 F.2d at 950.

Giving deference to the jury's subsidiary findings of fact and credibility choices, we agree with the jury that Petrolite acted with actual malice in defaming Brown and Micro–Bac. Petrolite acted with actual malice not because it failed to investigate but because despite knowledge of the limitations of its investigation and of reliable, contrary information it published false statements defaming Brown and Micro–Bac. The jury therefore was entitled to award Brown and Micro–Bac exemplary

damages.

D.

Petrolite presents three additional challenges to the jury's awards of exemplary damages. First, Petrolite argues that the jury was not entitled to award Brown exemplary damages because it found that he had suffered only nominal damages. Second, Petrolite contends that both awards are excessive under Texas law because they exceed a 3:1 ratio of exemplary to actual damages. Lastly, Petrolite maintains that the jury's award of exemplary damages is unconstitutional under the Supreme Court's decision in *Pacific Mut. Life Ins. Co. v. Haslip,* ⎯⎯ U.S. ⎯⎯, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

We note initially that, under Texas law, punitive or exemplary damages are proper, in libel actions, upon a showing of recklessness or malice. *Braun v. Flynt,* 726 F.2d 245, 256–57 (5th Cir.), *cert. denied sub nom. Chic Magazine, Inc. v. Braun,* 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984); *Rayzor,* 644 S.W.2d at 85–86. Punitive damages must bear a reasonable relationship, however, to the jury's award of actual damages. *Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1377 (5th Cir.1982); *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). Contrary to Petrolite's argument, the Texas courts have not adopted a "set rule or ratio between the amount of actual and exemplary damages which will be considered reasonable." *Kraus,* 616 S.W.2d at 910. See also *Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085, 1095 (5th Cir.1991), *cert. denied sub nom. Celotex Corp. v. Glasscock,* ⎯⎯ U.S. ⎯⎯, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992). As we observed in *Glasscock,* "[a]ppellate courts must conduct a case by case inquiry to decide whether a particular award satisfies the proportionality requirement." *Id.*

While Texas courts do not require a specific ratio between exemplary and actual damages, "[t]he Texas cases are unanimous in holding that recovery of actual damages is a prerequisite to receipt of exemplary damages." *Doubleday & Co v. Rogers,* 674 S.W.2d 751, 754 (Tex.1984) (libel

case). In other words, "[w]hen a jury fails to find a plaintiff has sustained actual damages, the plaintiff is foreclosed from recovering exemplary damages." *Wright v. Gifford–Hill & Co.,* 725 S.W.2d 712, 714 (Tex.1987).[7] See also *Nabours v. Longview Sav. & Loan Ass'n,* 700 S.W.2d 901, 903 (Tex.1985). This rule exists because traditionally the law does not punish even heinous conduct that does not cause injury and also because actual damages aid Texas courts in determining whether an award of exemplary damages is reasonable. *Wright,* 725 S.W.2d at 714. In the present case, the jury awarded Brown $1 in compensatory damages and $300,000 in exemplary damages. We agree with Petrolite that, having found that Brown had suffered only nominal damages, the jury was not entitled to award exemplary damages. *See Doubleday,* 674 S.W.2d at 754; *Mack v. Newton,* 737 F.2d 1343, 1363 (5th Cir.1984) (discussing Texas law).

Brown argues that the judgment awarded him $300,001 and did not segregate his recoverable damages. Brown ignores, however, the jury's special verdict, which specifically awards him $1 in compensatory damages and $300,000 in exemplary damages.[8] Despite the district court's final judgment, awarding Brown's damages in a single sum, the district court obviously did not intend to disturb the jury's apportionment of damages. Consequently, the jury's award of exemplary damages to Brown cannot stand.

We turn next to Petrolite's challenges to the jury's exemplary damage award of $700,000 to Micro–Bac, which Petrolite argues is excessive and not proportional to the $60,000 compensatory damage award. We have addressed these questions recently in *Glasscock,* which informs our decision in this case. In judging the reasonableness of an award of exemplary damages, "[t]he Texas Supreme Court instructs us to consider ... "(1) the nature of the wrong, (2) the character of the conduct

---

[7]In *Wright,* the Texas Supreme Court established a limited exception to this rule for cases under the Texas Workers' Compensation Act, which precludes recovery for actual damages. *Wright,* 725 S.W.2d at 714. The court distinguished cases not involving this Act where the juries had failed to find actual damages, including *Doubleday,* a libel case. *Id.*

[8]See Appendix.

involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which the defendant's conduct offends the public sense of justice and propriety.' " *Glasscock,* 946 F.2d at 1095 (quoting *Kraus,* 616 S.W.2d at 910).

Applying the *Kraus* factors, we conclude that the exemplary damage award to Micro–Bac is not excessive and is reasonably proportioned to the actual damages. A rational jury could have found that the nature of the defamation, Petrolite's culpability, and the public's sense of justice required Petrolite to pay substantial exemplary damages. Petrolite argues that a 12:1 ratio of exemplary to actual damages is excessive, but, in *Glasscock,* we upheld an award of 20:1. *See id.* at 1095–96. Petrolite has failed to demonstrate that the exemplary damage award is a result of the jury's passion rather than its reason. We therefore decline to disturb this award. *See id.* at 1096.

In *Glasscock,* we also addressed the constitutionality, in light of *Haslip,* of punitive damages awarded under Texas law. We concluded there that "Texas procedures for assessing and reviewing punitive damage awards satisfy the requirements of due process." *Id.* at 1097. We must determine, therefore, only whether the district court followed established Texas procedure.

In this case, the district court instructed the jury that if it found, by clear and convincing evidence, that Petrolite had defamed the plaintiffs and acted with actual malice in publishing the defamatory statements it could award punitive damages. The instructions defined "actual malice" and "clear and convincing evidence" and informed the jury that a negligent failure to ascertain the truth of published material could not alone support an award of punitive damages. The court further instructed the jury that "[p]unitive damages are designed to punish the offender and serve as an example to others. Whether or not to award such damages, and the amount thereof, are matters confided to you for decision." The court's instructions placed sufficiently meaningful limitations on the jury's discretion. We therefore decline to upset the jury's verdict.

III.

Petrolite argues next that the district court erred by failing to submit a specific question to the jury on the issue of truth. Petrolite contends that, in Texas, a court commits reversible error in refusing to submit a special issue on an affirmative defense, such as truth. While a federal court, sitting in diversity, must accurately describe the applicable state substantive law, federal law governs the form or manner of the court's instructions. *Turlington v. Phillips Petroleum Co.,* 795 F.2d 434, 441 (5th Cir.1986). The district court instructed the jury to find for Petrolite if it found the statements to be substantially true. The court's instruction and interrogatories complied with federal law. We therefore find no reversible error.[9]

IV.

Petrolite also contends that the district court erred in not granting Petrolite a new trial based on newly discovered evidence. Following the trial, Petrolite obtained an affidavit from a former Micro–Bac employee, who worked in the shipping and receiving department for several months in 1989. The affiant stated that, to the best of his knowledge, Micro–Bac had added $H_2S$ to its products, including Para–Bac, prior to shipping. Petrolite argues that this affidavit entitled it to a new trial because it proved that Micro–Bac products contain $H_2S$, a key issue at trial.

A "court may relieve a party ... from a final judgment, order, or proceeding" if the party finds "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Fed.R.Civ.P. 60(b)(2). Newly discovered evidence justifies relief under Rule 60(b)(2), however, only if the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment. *Resolution Trust Corp. v. Kemp,* 951 F.2d 657, 664 (5th Cir.1992) (citing *Harrison v. Byrd,* 765 F.2d 501, 503 (5th Cir.1985)).

_____

[9]Petrolite also asks us to find error in the court's failure to require the jury to answer special interrogatory 10, asking whether Petrolite was justified in committing any tortious interference. We need not address this issue because we do not reach the jury's finding on the tortious interference claim in affirming the verdict.

We review a district court's denial of a motion for new trial based on new evidence for abuse of discretion. *Id.*

In the present case, the district court did not abuse its discretion. Petrolite has not established that this evidence is either controlling or that it would clearly have produced a different result. Moreover, this evidence existed at the time of trial, and the court was entitled to conclude that Petrolite could have discovered it earlier by exercising due diligence.

V.

Petrolite argues lastly that the district court's injunction is overbroad and, therefore, constitutes a prior restraint.[10] Specifically, Petrolite contends that the injunction is overbroad in enjoining Petrolite from "making statements that the Para–Bac products contain SRB's; create HS [sic], do not work or cause corrosion." We agree with Petrolite that injunctions must be narrowly drawn and precise. *See Bernard v. Gulf Oil Co.,* 619 F.2d 459, 476 (5th Cir.1980), *aff'd,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); 7 James W. Moore, et al., *Moore's Federal Practice*

---

[10]The district court's injunction reads:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED, Defendant, Petrolite Corporation, its employees, servants and agents be and they are hereby permanently and perpetually enjoined and restrained from:
>
> > A. using the test samples or Plaintiffs' Micro-organisms obtained in March and/or April 1989 for any purpose;
> >
> > B. publishing statements concerning the Plaintiffs' products based on test samples of micro-organisms secured from a Coastal Oil and Gas Well Site in the Altamount [sic] Field in Vernal, Utah secured in March and/or April 1989;
> >
> > C. making statements that the Para–Bac products contain SRB's, create HS [sic], do not work or cause corrosion; and
> >
> > D. ordered to return to Fred G. Brown dba National Parakleen Company any and all results, documents, memorandum, materials or tests in the possession of Petrolite Corporation which were secured from a Coastal Oil and Gas Well Site in the Altamount [sic] Field in Vernal, Utah in March and/or April 1989.

R. at 546.

¶ 65.11, at 150–52 (2d ed. 1991).  The district court's injunction appears to be overly broad and beyond the relief that the appellees requested.  Therefore, we remand the court's order to allow the court to narrow its previous language so as to enjoin the dissemination of information relating to the tests and samples that were the subject of the underlying suit and not of independent, reliable information that Petrolite may acquire in the future.[11]

VI.

Finally, we address Micro–Bac's cross-appeal.  Micro–Bac appeals the district court's decision not to award post-judgment interest on the exemplary damage award.  Petrolite argues that the court correctly denied such interest because the caselaw does not support Micro–Bac's appeal and the policies underlying the award of post-judgment interest do not apply to exemplary damages.  We disagree.

In diversity actions, the federal post-judgment interest statute governs awards of post-judgment interest.  *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.,* 848 F.2d 613, 622–24 (5th Cir.1988).  This statute provides that a federal interest rate "shall be allowed *on any money judgment* in a civil case recovered in a district court."  28 U.S.C. § 1961(a) (Suppl.1992) (emphasis added).  Thus, the plain language of the statute authorizes post-judgment interest on punitive damages, which are a part of the "money judgment."

While few courts have addressed this issue, the courts that have addressed it have held that the statute contemplates post-judgment interest on exemplary damages.  *See Bank South Leasing, Inc. v. Williams,* 778 F.2d 704, 706 (11th Cir.1985);  *Dorsey v. Honda Motor Co.,* 673 F.2d 911,

---

[11]Petrolite also argues that the district court erred in upholding an order of the magistrate judge requiring Petrolite and Dr. Bryan, the independent testing expert, to surrender Dr. Bryan's data and final report to the appellees to protect Micro–Bac's proprietary interests.  Petrolite claims that the order would deprive Petrolite's expert of her work-product in case this court remands the case for a new trial.  We need not reach this issue, however, because of the limited nature of the remand.

912 (5th Cir. Unit B), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *Mill Pond Assocs. v. E & B Giftware, Inc.,* 751 F.Supp. 299, 303 (D.Mass.1990). Moreover, awarding post-judgment interest on exemplary damages is consistent with the purpose of post-judgment interest—compensation to a successful plaintiff for the intervening time between entitlement to and actual payment of an award of damages. See *Nissho–Iwai,* 848 F.2d at 623. Therefore, we reverse the district court's denial of post-judgment interest on Micro–Bac's award of exemplary damages and remand this issue to the district court with instructions to include post-judgment interest on the entire award.

## VII.

In conclusion, we affirm the judgment in favor of Brown for compensatory damages and of Micro–Bac for compensatory and exemplary damages. We reverse, however, the award of exemplary damages in favor of Brown. We also reverse the district court's denial of post-judgment interest on Micro–Bac's exemplary damage award. We vacate the district court's injunction so the court can narrow the injunctive relief on remand. Accordingly, the judgment is affirmed in part, vacated and reversed in part, and remanded to the district court for entry of judgment consistent with this opinion.

### AFFIRMED IN PART, VACATED AND REVERSED IN PART, AND REMANDED.

### APPENDIX

Jury Answers to Special Interrogatories

1. Do you find the information and conclusions contained in Petrolite Corporation's statements were a defamation of Fred G. Brown, dba National Parakleen Company?

Answer: Yes

2. Do you find, from clear an convincing evidence, that any statements by Petrolite Corporation concerning Fred G. Brown, dba National Parakleen Company was [sic] made with

knowledge it was [sic] false or with reckless disregard of whether it was [sic] false?

Answer: Yes

3. Do you find the information and conclusions contained in Petrolite Corporation's statements were a defamation of Micro–Bac International, Inc.?

Answer: Yes

4. Do you find, from clear and convincing evidence, that any statement made by Petrolite Corporation concerning Micro–Bac International, Inc. was made with knowledge it was false or with reckless disregard of whether it was false?

Answer: Yes

5. Do you find Petrolite Corporation obtained dominion or control over any property owned or controlled by Fred G. Brown, dba National Parakleen Company without express or implied consent of Fred Brown?

Answer: Yes

6. Do you find Petrolite Corporation tortiously interfered with either an existing business relationship between Fred G. Brown, dba National Parakleen Company and any of the entities below, or with a prospective business relationship between Fred G. Brown, dba National Parakleen Company and any of the entities below which had a reasonable probability of being finalized?

(1) Coastal Oil & Gas
    Answer: Yes
(2) Discovery Oil & Gas
    Answer: No
(3) Don Sparks

Answer: No

(4) Phil Iverson

Answer: No

(5) Greg Thaggard

Answer: No

(6) John Elder

Answer: No

(7) Micro–Bac International, Inc.

Answer: No

(8) Pennzoil

Answer: No

(9) Calaco Oil & Gas

Answer: No

7. Do you find from clear and convincing evidence Petrolite Corporation acted with malice in interfering, with Fred G. Brown, dba National Parakleen Company's existing or prospective business relationship with any of the entities named above?

Answer: Yes

8. Do you find Petrolite Corporation tortiously interfered with either an existing business relationship between Micro–Bac International, Inc., and any of the entities named below, or with a prospective business relationship between Micro–Bac International, Inc., and any of the entities named below which had a reasonable probability of being finalized?

(1) Coastal Oil & Gas

Answer: No

(2) Fred G. Brown dba National Parakleen Company

Answer: No

(3) Jim Weatherall

Answer: No

(4) Sea–Bac, Inc.

Answer: No

9. Do you find from clear and convincing evidence Petrolite Corporation acted with malice in interfering, with Micro–Bac International, Inc.'s existing or prospective business relationship with any of the entities named above?

Not answered

10. Do you find the interference if any of Petrolite Corporation was justified under the circumstances?

A. As to Fred G. Brown dba National Parakleen Company?

Not answered

B. As to Micro–Bac International, Inc.?

Not answered

11. Do you find Petrolite Corporation was negligent in any of the following:

1. Failing, if at all to ascertain the materials obtained and tested from the drums located in Coastal Oil & Gas' treater station in the Altamont Field were inventory, as opposed to experimental materials;

Answer: Yes

2. Conduct proper field tests before making and disseminating the information and conclusions contained in the statements made by Petrolite;

Answer: Yes

3. Properly perform pour-point tests;

Answer: Yes

4. Properly obtain samples, analyze data, perform field tests, and obtain all necessary information before performing lab tests, writing reports, or disseminating information?

Answer: Yes

12. Do you find Petrolite Corporation's negligent conduct constituted "gross negligence"?

As to Fred G. Brown dba National Parakleen Company

Answer: Yes

As to Micro–Bac International, Inc.?

Answer: Yes

13. Do you find Petrolite Corporation commercially disparaged any of the products or services provided by Fred G. Brown dba National Parakleen Company?

Answer: Yes

14. Do you find Petrolite Corporation intended the statement to resul t in harm to Fred G. Brown, dba National Parakleen Company, or recognized the statement was likely to result in financial harm to Fred G. Brown dba National Parakleen Company?

Answer: Yes

15. Do you find Petrolite Corporation commercially disparaged any of the products manufactured by Micro–Bac International, Inc.?

Answer: Yes

16. Do you find Petrolite Corporation intended the statement to result in harm to Micro–Bac International, Inc., or recognized the statement was likely to result in financial harm to Micro–Bac International, Inc.?

Answer: Yes

17. What sum of money if paid in cash would fairly and reasonably compensate Fred G. Brown dba National Parakleen Company for the damages, if any, proximately caused by the conduct

of Petrolite Corporation?

You may consider the following elements, but none other.

A. Loss of professional reputation and injury to Fred G. Brown dba National Parakleen Company's honesty and integrity in the past;

B. Loss of professional reputation and injury to Fred G. Brown dba National Parakleen Company's honesty and integrity in the future;

C. Loss of business profits to Fred G. Brown dba National Parakleen Company in the past; and

D. Loss of business profits to Fred G. Brown dba National Parakleen Company in the future;

Answer: $1.00

18. What sum of money if paid in cash would fairly and reasonably compensate Micro–Bac International, Inc., for the damages, if any, proximately caused by the conduct of Petrolite Corporation?

You may consider the following elements, but none other.

A. Loss of professional reputation and injury to Micro–Bac International, Inc., [sic] honesty and integrity in the past;

B. Loss of professional reputation and injury to Micro–Bac International, Inc., [sic] honest and integrity in the future;

C. Loss of business profits to Micro–Bac International, Inc. in the past;

D. Loss of business profits to Micro–Bac International, Inc. in the future; and

E. Cost of advertising to correct false statements made about Micro–Bac International, Inc., and its products

Answer: $60,000

19. What do you find to be the fair market value, if any, on or about May 1989, in Vernal, Utah, of any property that was converted, by Petrolite Corporation?

Answer: $0

20. What sum of money, if paid now in cash, should be assessed against Petrolite Corporation as exemplary damages for its conduct against Fred G. Brown dba National Parakleen Company?

Answer: $300,000

21. What sum of money, if paid now in cash, should be assessed against Petrolite Corporation as exemplary damages for its conduct against Micro–Bac International, Inc.?

Answer: $700,000

R. 484–490, 619–26.