MMAR GROUP, INC., Plaintiff,

v.

DOW JONES & COMPANY, INC. and
Laura Jereski, Defendants.

No. CIV. A. H–95–1262.

United States District Court,
S.D. Texas,
Houston Division.

Nov. 6, 1997.

Kenneth Morris, Mark Harwell, Morris & Campbell, Houston, TX, for Plaintiff.

David H. Donaldson, Jr., R. James George, Jr., George, Donaldson & Ford, Austin, TX, for Defendants.

## MEMORANDUM AND ORDER

WERLEIN, District Judge.

The Court's Memorandum entered May 27, 1997, regarding Defendants' Post–Verdict Motion for Judgment as a Matter of Law (Document No. 177) and Plaintiff's Motion for Entry of Judgment (Document No. 178), is withdrawn, although the Order accompa-

nying that Memorandum and the Final Judgment entered of even date therewith, remain intact. Also pending are Defendants' Motion for Judgment as a Matter of Law or, Alternatively, Motion for New Trial (Document No. 201), and Plaintiff's Motion to Alter or Amend Judgment (Document No. 203). After careful consideration of the motions, briefs, oral arguments, and governing authorities, the Court concludes as follows:

### The Standard for Judgment as a Matter of Law

In *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc), *overruled on other grounds, Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 336–37 (5th Cir.1997), the Court set forth the standard for deciding a motion for directed verdict and motion for judgment notwithstanding the verdict; this standard now applies to Rule 50 motions for judgment as a matter of law:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence— not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

411 F.2d at 374–75 (footnote omitted). This decision, cited and followed by the courts of this circuit in many hundreds of cases since 1969, provides the framework for the analysis that follows. See *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705 (5th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997) ("It goes without saying that the standard of review for Rule 50 motions for judgment is found in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc).") "The aim is to determine whether a rational jury could reach the conclusion that this jury actually reached." *Fields v. J.C. Penney Co., Inc.*, 968 F.2d 533, 536 (5th Cir.1992).

The standard to be applied in deciding a Rule 50 motion is the same in the trial court and in the court of appeals. *Hiltgen v. Sumrall*, 47 F.3d 695, 699–700 (5th Cir.1995); *London v. MAC Corp. of America*, 44 F.3d 316, 318 (5th Cir.) *cert. denied*, 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995), *citing Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 950 (5th Cir.1994), *cert. denied*, 513 U.S. 1154, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995).

It has long been held that the directed verdict practice does not offend the Seventh Amendment. *Galloway v. United States*, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943); *Boeing Co. v. Shipman*, 411 F.2d at 374, n. 13. Nonetheless, the Fifth Circuit upon a number of occasions has reminded us of the stricture of the Seventh Amendment. For example, in *Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 865 (5th Cir.1983), the Court wrote:

This Court affords great deference to jury findings. The Seventh Amendment to the Constitution provides that no fact tried by a jury shall be re-examined by any court of the United States except according to the rules of common law. For that reason, an appellate court may not reweigh the evidence or set aside the jury's verdict merely because the appellate judges could have drawn different inferences or conclusions

from the evidence, or feel that other results might be more reasonable.

*See also Gaspard v. Taylor Diving & Salvage Co., Inc.,* 649 F.2d 372, 374 n. 2 (5th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982) ("We are mindful that, in light of the seventh amendment guarantee of the right to jury trial, we must proceed cautiously, and we must validate the jury verdict if at all possible."); *Narcisse v. Illinois Cent. Gulf R. Co.,* 620 F.2d 544, 546 (5th Cir.1980) ("We must consider whether the trial court accorded the deference to the [ ] jury's verdict which is required by the seventh amendment to the Constitution").

### The Verdict on Liability

Defendants in their Post–Verdict Motion first argue that judgment should be granted to Defendants because the evidence did not support the verdict on liability. The jury found from a preponderance of the evidence that five of the challenged statements contained in the Article were false and defamatory, and that Dow Jones and Laura Jereski were each negligent in publishing those statements. Because Plaintiff was neither a general purpose nor a limited purpose public figure, it was required to prove only that Defendants were negligent in making the libelous statements. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349–51, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974); *Einhorn v. LaChance,* 823 S.W.2d 405, 413 (Tex.App.— Houston [1st Dist.] 1992, writ dism'd w.o.j.), *cert. denied,* 517 U.S. 1135, 116 S.Ct. 1420, 134 L.Ed.2d 544 (1996).

On each of the five statements that the jury found were false and defamatory and that Defendants were negligent in publishing, the Court finds that there was substantial evidence of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions with respect to the libel and the negligence of Defendants.

### The Verdict on Compensatory Damages

With regard to the verdict on compensatory damages, Defendants present two main arguments in their post-verdict motions: first, that "there is no evidence linking any of the five statements directly to any damage to MMAR," and second, that if "Plaintiff has shown that it suffered some harm for which it is entitled to compensation, that harm was at most $1.5 or $1.65 million." Defendants' Motion for Judgment as a Matter of Law or, Alternatively, Motion for New Trial, 10. The first argument essentially is that there was no evidence that the libelous statements were a proximate cause of injury to MMAR, that is, a failure to prove factual causation. The second argument essentially challenges the legal sufficiency of the evidence to support a compensatory damage award of $22.7 million.

■ In support of their first argument, Defendants contend (as they argued to the jury) that MMAR was a doomed business, which failed not as a result of publication of the Article, but rather as a result of a suit LASERS filed against it, and an impending NASD investigation. Defendants rely on two well known cases, *Dillon v. Twin State Gas & Electric Co.,* 85 N.H. 449, 163 A. 111 (1932)[1] and *Travelers Indemnity Co. v.*

---

1. In *Dillon,* a fourteen year old boy lost his balance while on a bridge girder. He instinctively took hold of a charged electric wire to save himself from falling and was electrocuted. The electric wire normally was not charged with electric current during daylight hours, when the accident occurred. The administrator of the boy's estate brought suit against the electric company. In affirming the lower court's denial of the defendant's motion for a directed verdict, the Supreme Court of New Hampshire considered not only how different fact findings might affect the measurement of the plaintiff's damages and the defendant's liability (would the boy have momentarily fallen to his death or to serious injury even without the line being charged with electricity?), but also the factual causation issue itself (would the boy have regained his balance and not have fallen but for the current?). The Court concluded:

> His probable future but for the current thus bears on liability as well as damages. Whether the shock from the current threw him back on the girder or whether he would have recovered his balance, with or without the aid of the wire he took hold of, if it had not been charged, are issues of fact.

*Dillon,* 163 A. at 115. Comparable issues of fact were raised by the evidence in this trial, and, as in *Dillon,* were submitted to the jury.

*McKillip*, 469 S.W.2d 160 (Tex.1971),[2] for the proposition that MMAR failed to carry its burden of establishing that its demise, and damages, were caused by the libelous statements in the Article. MMAR's representatives, however, testified that its business failure was directly attributable to the false and defamatory statements in the Article. MMAR also elicited evidence from a former customer, who was experienced and knowledgeable in the securities trading business, that the challenged statements, including each of the five that the

jury found were libelous, would make MMAR's customers less likely to do business with MMAR. MMAR also presented evidence of *The Wall Street Journal's* preeminence as a source of business news in the United States, its highly sophisticated readership, and of MMAR's precipitous loss of business in the twenty-one days immediately following publication of the Article. MMAR also presented expert opinion evidence of MMAR's value both before and after the impact of the publication.

The Court defined "proximate cause" for the jury as

that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Defendants interposed no objection to this definition. The conflicting evidence in the record on the proximate cause issue, when considered in light of and with all reasonable inferences drawn in Plaintiff's favor, does not point so strongly and overwhelmingly in Defendants' favor so as to warrant the granting of Defendants' Motion for Judgment as a Matter of Law. As in *Dillon*, there was evidence raising issues of fact—which conflicting evidence was vigorously argued to the jury by both sides—on whether MMAR's demise was a foregone conclusion or whether it would not have occurred but for Dow Jones's publication of the libelous statements. The Court concludes that there was legally sufficient evidence that the five false and defamatory statements in the Article were a proximate cause of MMAR's business failure.

In support of their second argument, Defendants contend that there is no evidence that attributes the amount of MMAR's damages to the five statements that were found to be false and defamatory, as distinguished from the remainder of the Article.

There is a "strong and legitimate state interest in compensating private individuals" for the injury sustained, but this state interest "extends no further than compensation for actual injury." *Gertz*, 418 U.S. at 347–49, 94 S.Ct. at 3011. Although Plaintiff is entitled to recover no damages for the constitutionally protected portion of the publication, it is entitled to recover damages for those "losses proximately caused by unlawful conduct." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 917–19, 102 S.Ct. 3409, 3428, 73 L.Ed.2d 1215 (1982).

There was substantial evidence that MMAR sustained a precipitous decline in its theretofore substantial revenues immediately following publication of the false and defamatory statements. Other proof, including the testimony of persons knowledgeable about the securities industry, and the likely reaction of MMAR's customers to the false and defamatory statements in the Article, provided evidence of Plaintiff's injuries and resulting damages. Damages are often difficult to prove, and unliquidated damages proximately

---

**2.** *McKillip*, which was based on disputed causes of a turkey barn collapse for insurance purposes, is not apposite to the analysis required in the instant case. The barn was hit by a windstorm, and stood, and a week later hit by a snowstorm, and fell. The defendant insurance company pled a policy exclusion, for damages caused by snowstorms. Because snowstorms were an excluded peril, the insured was required to prove that the damage sustained by his fallen turkey barn had been caused solely by the earlier windstorm, which was an insured peril, and not by the pleaded excluded hazard. Plaintiff failed to do so, and the case was reversed. Unlike *McKillip*, MMAR was not required to prove that it had not been damaged by an "excluded peril," but only that Dow Jones's libel was a proximate cause of Plaintiff's injury, and that Plaintiff had sustained damages proximately caused by that wrongful conduct.

caused by an event are rarely ever capable of being proved with exactitude, much less with the kind of precision, for which Defendants now argue.

The jury was instructed emphatically to award no damages, if any, that Plaintiff may have sustained by reason of any statements in the Article, even though they may have been defamatory, if those statements were true or substantially true. The charge read:

> Plaintiff is not entitled to recover damages, if any, for any of the other statements in the Article—even though they may have been defamatory—if those statements were true or substantially true. In other words it is only for injuries, if any, proximately caused by Defendants' **false and defamatory** statements, if you have found such in your answer to Interrogatory No. 1, that Plaintiff MMAR obtain a recovery of damages.

Court's Instructions to the Jury, p. 21 (emphasis in text of Instructions to the Jury). Neither Plaintiff nor Defendants objected to these instructions.

Defendants maintain, however, that there was not evidence directly attributing the $22.7 million in damages only to the false and defamatory statements as distinguished from other portions of the Article that were constitutionally protected. Defendants argue that the lack of allocation evidence, evidence that would have allowed the jury to discriminate finely between damages caused by the false and defamatory statements and damages caused by constitutionally protected statements, justifies either a take nothing judgment in their favor or a new trial.

The false and defamatory statements contained in the Article, of course, were not statements published in isolation. These libelous statements could not be considered by either the jury or MMAR's customers in isolation or without reference to the Article as a whole. At oral argument on this motion the Court inquired as to how a plaintiff, libeled in five statements contained in a larger article, could prove the amount of damage attributable to a particular libelous statement as distinguished from other statements. Defendants' counsel replied that such a plaintiff should call a customer to testify that the particular libelous statement persuaded the customer not to purchase the plaintiff's product. Presumably, although Defendants' counsel did not explain further, there would then have to be some extrapolation from the testifying customer's decision not to buy the plaintiff's product to the expected similar responses from the plaintiff's other customers. And presumably proof of aggregate lost sales and revenues experienced by the plaintiff after the published libel, and not otherwise explained, would be the next element of proof.

MMAR's proof basically followed this outline advocated by Defendants, except that MMAR presented, among others, a former customer and experienced securities trader, instead of a current customer, for proof that each of the false and defamatory statements would make MMAR's customers less likely to do business with MMAR. The sudden decline in MMAR's business just after publication of the libelous statements must be viewed at least as some corroborating evidence of the damages caused by the libel.

The major point of difference between MMAR and Defendants on the damage question seems really not to have been in how to show that the libel caused customers not to do business with MMAR, but in whether the false and defamatory statements actually caused MMAR to fail, or merely to lose profits. Defendants, who presented damage evidence on the latter assumption, argue that lost profits in an amount of $1.5 or $1.65 million are the only proven damages that MMAR could recover. MMAR, however, offered evidence that the loss of business caused by the libel was so severe that the business had to be closed to avoid even greater losses; hence, the damage model of MMAR was based on the diminished value of the failed company caused by the libel, which MMAR's evidence showed was from $32 million to $42 million.

Proof of business loss or destruction attributable to certain tortious conduct is difficult. Although there may be ready proof that tortious activity damaged the business concern, proof of the exact amount of loss or damage caused by the tortious conduct, as opposed to

other business factors, is generally elusive.[3] This was recognized in an analogous antitrust context in *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), and *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). In each of those cases, the Supreme Court acknowledged that damages associated with business loss and destruction are generally not amenable to exact proof, but that such will not prevent an injured business from recovering damages.

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party.

*Story*, 282 U.S. at 560–66, 51 S.Ct. at 250–51 (citations omitted). In *Bigelow*, the Supreme Court observed that this principle is not confined to business injuries in antitrust cases:

> The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. That

principle is an ancient one, and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application.

*Bigelow*, 327 U.S. at 264–66, 66 S.Ct. at 580 (citations omitted); *see also J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565–69, 101 S.Ct. 1923, 1929–1930, 68 L.Ed.2d 442 (1981) (citing *Story* and *Bigelow* with approval); and *Gertz*, 418 U.S. at 349–51, 94 S.Ct. at 3012 (in libel cases, as long as juries are limited by appropriate instructions, and "supported by competent evidence concerning the injury", there need be "no evidence which assigns an actual dollar value to the injury").[4]

■ The jury's compensatory damage finding is supported by just and reasonable inferences from competent evidence. There was, of course, the underlying dispute of whether the libelous statements caused the demise of MMAR with resulting damages of between $32 million to $42 million, or whether, as Defendants argued on the damages question, the libelous statements caused only a loss of profits in the range of from $1.5 million to $1.65 million. On this fundamental controversy, there was substantial and conflicting evidence, which was forcefully argued to the jury by both sides. Obviously, the jury had to grapple with that disputed evidence in answering the damage question and, as well, was required to follow the Court's emphatic instructions to award damages "only for injuries, if any, proximately caused by Defendants' **false and defamatory** statements." The jury's finding of $22.7 million in damages, was within the range of the testimony at trial and is supported by legally sufficient evidence. *See Neiman–Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 372 (5th Cir.1990) ("The jury enjoys substantial discretion in awarding damages within the

---

3. The Court instructed the jury, without objection from Plaintiff or Defendants: "Because there is no set rule for the assessment of damages to a business in a case such as this, you may consider all of the evidence that has been admitted before you on the subject of damages." Jury Instruction at p. 21.

4. *See also* David W. Robertson, *The Common Sense of Cause in Fact*, 75 TEX L. REV 1765, 1794 (1997) ("In traditional judicial thinking, we must

guard against holding a defendant responsible when he has caused no harm, but once we know that he has caused some harm, we need not worry overmuch about making him pay too much. As Judge Posner has written, 'a tort plaintiff's burden of proving the extent of his injury is not a heavy one. Doubts are resolved against the tortfeasor' ", quoting *DePass v. United States*, 721 F.2d 203, 209 (7th Cir.1983) (Posner, J., dissenting)).

range shown by the evidence"); *City of Houston v. Harris County Outdoor Advertising Ass'n,* 879 S.W.2d 322, 334 (Tex.App.— Houston [14th Dist.] 1994, writ denied), *cert. denied,* 516 U.S. 822, 116 S.Ct. 85, 133 L.Ed.2d 42 (1995) ("[T]he trier of fact has the discretion to award damages within the range of the evidence presented at trial").

The Court must determine only if there is substantial evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might find that Plaintiff suffered quantifiable damages as a proximate cause of the published statements found by the jury to be both false and defamatory. There was such evidence.

### The Verdict on Punitive Damages Against Dow Jones

The First Amendment requires an elevated standard of proof for the recovery of punitive damages in a libel case brought by a private party against a newspaper.

[A] private defamation plaintiff must prove, by clear and convincing evidence, that the defendant acted with "actual malice" in publishing the defamatory statement to justify punitive damages.

*Brown v. Petrolite Corp.,* 965 F.2d 38, 46 (5th Cir.1992), *citing Gertz,* 418 U.S. at 349–51, 94 S.Ct. at 3012. The term "actual malice," as applied to. this analysis, is a term of art developed *in New York Times Co. v. Sullivan,* 376 U.S. 254, 279–81, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964) and its progeny. A defamatory statement is made with actual malice if made with knowledge that it is false or with a reckless disregard of whether it is false or not. Reckless disregard means a "high degree of awareness of ... probable falsity," although the term "cannot be fully encompassed in one infallible definition." *St. Amant v. Thompson,* 390 U.S. 727, 729–31, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Brown,* 965 F.2d at 46.

In *Brown* the Fifth Circuit described the heightened review required in a case such as this:

[W]e do not defer to the jury but, instead, must conduct an independent review of the record to determine whether it presents clear and convincing evidence of [the defendant's] actual malice.... We limit this heightened review, however, to the ultimate factual finding of the constitutionally mandated actual malice element. Our inquiry does not require us to conduct a de novo review of the jury's determinations on preliminary factual issues or questions of credibility.

*Id.* at 46 (citations omitted).

The parties agree that the foregoing principles apply to this case. The parties also agree that Texas law imposes upon MMAR, in order to recover punitive damages from Dow Jones as a principal because of the act of Ms. Jereski, the burden of proving the following:

1. Dow Jones or a managerial agent of Dow Jones authorized the doing and the manner of the act, or

2. Ms. Jereski was unfit and Dow Jones or a managerial agent was reckless in employing or retaining her, or

3. Some agent was employed by Dow Jones in a managerial capacity and was acting in the scope of employment, or

4. Dow Jones or a managerial agent of Dow Jones ratified or approved the act.

See *Fort Worth Elevators Co. v. Russell,* 123 Tex. 128, 70 S.W.2d 397, 404–406 (1934).

In Interrogatory No. 4, the Court inquired of the jury and the jury responded as follows:

Do you find from clear and convincing evidence that Dow Jones and/or Laura Jereski published the Article with knowledge of the falsity, or with a high degree of awareness of the probable falsity, or with serious doubt as to the truth of any of the statements that you found were false and defamatory in your answer to Interrogatory No. 1?

Answer "Yes" or "No" as to each Defendant:

ANSWER: (a) Dow Jones Yes
 (b) Laura Jereski Yes

Dow Jones contends that MMAR failed to establish with "convincing clarity" that Dow Jones published false, defamatory statements with actual malice—that is, with the knowledge that they were false or with a "high degree of awareness of [ ] their probable

falsity," as required by *Gertz* and its progeny.

█ Apart from the reporter Laura Jereski, whose conduct is separately discussed below, the evidence is uncontroverted that the only other persons employed by Dow Jones who arguably had any role in the preparation or publication of the Article were Gay Miller, Jonathan Clements, Byron Calame, and Stuart Karle. Mr. Karle was a lawyer for the Journal, whose only involvement appears to have been in receiving oral and written complaints from MMAR's lawyers about Ms. Jereski's investigation of MMAR before the Article was published. There is no evidence that he had an editorial function or had any authority to direct publication of the Article. Moreover, there is no evidence that Mr. Karle had any knowledge of the falsity, or had any awareness whatever of the probable falsity, or a serious doubt as to the truth of any of the statements in the Article that were found to be false and defamatory. The peripheral involvement of Mr. Karle provides no basis whatever for a jury to find with convincing clarity that Dow Jones acted with actual malice.

█ Mr. Calame, who testified at trial, was the Journal's deputy managing editor. Although he routinely read the front page and lead stories word for word before publication, he was not involved in Ms. Jereski's development of the Article (which was not a front page story) or in its editing, except possibly for having had a voice in the decision to pull from an earlier draft references to unlawful use of drugs at MMAR. After the fact, and in conjunction with preparing to defend this lawsuit, it appears that Mr. Calame read the Article, reviewed the earlier drafts, and formed a belief that the Article contained no statements that, in the context of the entire story, were false or that would mislead a reader. Plaintiff has pointed to no evidence that Mr. Calame, at the time the Article was published, had any knowledge of the falsity of any statement, or a high degree of awareness of the probable falsity of any statement, or had any serious doubt or, indeed, any basis for serious doubt as to the truth of any statement published in the Article.

Ms. Miller was Ms. Jereski's supervising editor. Ms. Miller had been an employee of the Journal for twenty-one years, and had received her first editing assignment in 1981. In 1993 she was a news editor in the Money and Investing Section of the Journal, and supervised several reporters. Ms. Miller edited the early drafts of Ms. Jereski's article, raised questions, made comments, and otherwise performed editorial oversight. Before the Article was completed and published, however, Ms. Miller went on vacation and assigned Jonathan Clements, a reporter in whom she had confidence, to act as editor in her absence. Mr. Clements had been employed by the *Journal* for nearly four years, and had previous journalistic experience. He completed the editing of Ms. Jereski's Article. Both Ms. Miller and Mr. Clements testified at trial.

During oral arguments on the matter under consideration, the Court asked Plaintiff for the proof that any managing editor of Dow Jones either authorized or agreed knowingly to publish a false statement written by Ms. Jereski. Plaintiff responded in oral submissions, and later in a brief, that the jury could find that Gay Miller and Jonathan Clements had knowledge of the falsity, or a high degree of awareness of the probable falsity, of two of the statements that the jury found to be libelous. These were the limousine expense statement and the Raymond James role statement:

**In one year, the firm ran up $2 million in limousine bills, according to Raphael Grinburg, a former employee who used to monitor travel expenses for the firm.**

and

**The frenetic trading prompted Raymond James to take the unusual step of assigning a trader to track MMAR's complex deals. Raymond James became so concerned about the pace of MMAR's trades that it imposed a 4% limit on commissions. According to Mr. Robinson, MMAR's salesmen violated the limit periodically, prompting him to adjust the trades so that the limits were maintained.**

■ The limousine expense statement was inserted into the Article after Ms. Miller went on vacation and Mr. Clements assumed the editorial function. This insertion replaced another example of MMAR's "free wheeling atmosphere" that had been in the draft examined by Mr. Clements, namely, a reference to the drug usage of MMAR's Mr. Brown to the effect that "Mr. Brown used to hand out marijuana from a five gallon Charles Chip can to salesmen." Not being sure that there was such a thing as a five gallon Charles Chip can and concerned that unlawful drug usage was not pertinent to the story, Mr. Clements deleted this passage. Ms. Jereski subsequently interviewed Mr. Grinburg, who ran MMAR Travel, the MMAR-owned travel agency through which Plaintiff's employees booked their travel, who told her in effect that he had been "doubly amazed at [MMAR's] travel and entertainment" and described an expenditure of $2 million a year on "black cars." At trial Mr. Grinburg testified that the $2 million for black cars had been incurred by Fundamental Brokers, a MMAR affiliate, before that company was acquired by MMAR or its principals. Ms. Jereski testified that she understood the expenditure to have been incurred by MMAR when she wrote that "the firm ran up $2 million in limousine bills" in one year. She substituted the limousine expense anecdote for the drug use statement as an example of MMAR's free wheeling atmosphere. There is no evidence that Mr. Clements asked Ms. Jereski anything about this substituted statement, or about the reliability of its source. Whether or not Mr. Clements was a managing agent of Dow Jones, there is no evidence that he knew of the falsity of the statement, or had a high degree of awareness of its probable falsity, or had any serious doubt as to the truth of the statement. That he failed to inquire and to verify its accuracy is not enough. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 687–89, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989) ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."); *St. Amant v. Thompson,* 390 U.S. 727, 731–33, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968) ("Failure to investigate does not in itself establish bad faith.").

■ Plaintiff's other assertion that an editor acted with actual malice is directed against Ms. Miller. Plaintiff points out that an earlier draft of the Raymond James role statement did not include the adjective "unusual." Before leaving on vacation Ms. Miller inquired of Ms. Jereski whether Raymond James's assignment of a trader to track MMAR's complex deals was unusual. Ms. Jereski, who had already interviewed Mr. Robinson on this subject, inserted the word "unusual." Again, Ms. Miller's failure to ask any further questions of Ms. Jereski on that subject, and Mr. Clements's failure to ask any questions about it when he edited the piece, is far less than would be required to provide "clear and convincing evidence" that either Ms. Miller or Mr. Clements acted with actual malice. The failure to ask more questions or to investigate the basis for the reporter's inclusion of the descriptive term "unusual" does not constitute clear and convincing evidence from which a reasonable juror could find that either Ms. Miller or Mr. Clements had knowledge of the falsity, or a high degree of awareness of the probable falsity, or harbored serious doubts as to the truth of the Raymond James role statement. *See Harte–Hanks Communications, Inc.,* 491 U.S. at 687–91, 109 S.Ct. at 2696; *St. Amant,* 390 U.S. at 731–33, 88 S.Ct. at 1326.

### The Verdict on Punitive Damages Against Laura Jereski

■ In contrast to the absence of clear and convincing evidence that Dow Jones acted with any actual malice, the evidence of actual malice against Laura Jereski is sufficient to allow a reasonable jury to conclude with convincing clarity that Ms. Jereski published the statements found by the jury to be false and defamatory with knowledge of their falsity, or with a degree of awareness of their probable falsity, or with serious doubt as to their truth. In addition to the evidence regarding Ms. Jereski's investigation, and the evidence of discrepancies between what she was or was not told and what she wrote, there is also considerable evidence that enmity developed between Ms. Jereski and those

acting for MMAR during her preparation of the Article. For example, a month before the Article was published, MMAR's lawyers addressed a letter to the Journal's lawyer, Mr. Karle, stating concerns about Ms. Jereski's competence as a reporter. Ms. Jereski was accused of improperly raising certain issues with MMAR's clients and it was claimed that if she continued in like fashion her conduct "may cause inexcusable and irreparable damage to MMAR." (Defendants' Exhibit No. 37). The tension between MMAR and Ms. Jereski increased when MMAR refused to grant a personal interview to her. MMAR insisted that Ms. Jereski submit written questions, a number of which she framed in a hostile tone, and which MMAR answered in a sometimes truncated or curt fashion. This and other evidence support inferences that personal hostility existed between MMAR and Ms. Jereski before she completed the Article.

The presence of a motive to publish a false statement is a proper evidentiary consideration in a case such as this. *See Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir.1992) ("The record reveals that Petrolite had the motive to publish a false report and that it acted negligently in preparing the report.").[5] The evidence of MMAR's preemptive complaints to Ms. Jereski's still relatively new employer, and MMAR's declared mistrust of Ms. Jereski that was emphasized by its refusal even to grant her a personal interview, constituted facts from which a reasonable juror might have inferred that Ms. Jereski was motivated to retaliate against MMAR, with the pen as her weapon. In sum, after consideration of all of the evidence regarding Ms. Jereski, including, but not limited to the evidence briefly noted above, viewed in a light and with all reasonable inferences drawn most favorable to Plaintiff, the Court concludes that there was substantial evidence from which a reasonable juror might find with convincing clarity that Ms. Jereski acted with actual malice.

*Whether Dow Jones is Liable for Punitive Damages for Laura Jereski's Actual Malice*

In order for MMAR to recover punitive damages from Dow Jones based upon the conduct of one of its agents, under Texas law there must be some evidence of fault on the part of Dow Jones or its managerial agents. Thus, as recited above at page 15, MMAR had the burden of proving the following:

1. Dow Jones or a managerial agent of Dow Jones authorized the doing and the manner of the act, or

2. Ms. Jereski was unfit and Dow Jones or a managerial agent was reckless in employing or retaining her, or

3. Some agent was employed by Dow Jones in a managerial capacity and was acting in the scope of employment, or

4. Dow Jones or a managerial agent of Dow Jones ratified or approved the act.

*See Fort Worth Elevators Co. v. Russell*, 123 Tex. 128, 70 S.W.2d 397, 404–06 (1934).

Indeed, Texas has been recognized as being among that "substantial minority of courts" which declare that an employer may not be held vicariously liable for punitive damages "unless it either authorizes, participates in, or ratifies the employee conduct giving rise to such damages." *Embrey v. Holly*, 293 Md. 128, 442 A.2d 966, 969–70 (1982), *citing* at n. 8 *Gulf, C. & S.F. Ry. Co. v. Reed*, 80 Tex. 362, 15 S.W. 1105 (1891). Thus, as Dow Jones argues, Texas law precludes the imposition of punitive damages upon the publisher of a libelous statement without independent proof that the publisher, here the corporation, authorized or ratified the publication with the requisite state of mind. *See Wortham–Carter Publ'g Co. v. Littlepage*, 223 S.W. 1043, 1046 (Tex.Civ. App.—Fort Worth 1920, no writ) (judgment for punitive damages against publisher of *Fort Worth Star Telegram* reversed; corporation can be held liable for exemplary damages "only in these cases where the agent

---

5. There is no evidence, and Plaintiff has made no argument, that the *Journal* itself or any of its managing agents had any motive whatever to retaliate against or to libel Plaintiff. Apart from the *Journal's* lawyer who received the letter from MMAR's lawyer, and who had no authority to publish the Article, it appears that there was no interaction by MMAR with any employee of the Journal except Ms. Jereski.

who acted with express malice is alleged and shown to be something more than a mere servant, in other words, an alter ego of the corporation, or when the malicious act of the servant is alleged and shown to have been adopted or ratified by the corporation after knowledge of the malice."); *accord Associated Press v. Walker,* 393 S.W.2d 671 (Tex.Civ. App.—Fort Worth 1965, writ ref'd n.r.e.), *rev'd sub nom. on other grounds, Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (affirming trial court's decision to set aside punitive damage award because plaintiff failed to meet requirements of *Wortham–Carter Publ'g Co. v. Littlepage* ).

■ MMAR contends that Defendants waived this argument by failing to object to the Court's submission of the punitive damage interrogatory and by not moving for judgment as a matter of law on this point before it was submitted to the jury.

In reply, Defendants rely upon their Motions for Judgment as a Matter of Law made at the close of Plaintiff's evidence and at the close of all evidence in which they argued that Plaintiff failed to prove by clear and convincing evidence that Defendants acted with knowledge that the challenged statements were false, or with a high degree of awareness that the statements were probably false, and that there was no legally sufficient evidence to support a finding that the Defendants' subjective state of mind was one of awareness of falsity or probable falsity. Indeed, in reviewing the latter motion the Court finds that Defendants argued for judgment as a matter of law based, among other things, on each of the statements being substantially true, no proof of negligence by Defendants, the absence of proof that Defendants acted with actual malice, and the failure of Plaintiff to prove itself entitled to any damages under accepted methods of measurement. Relying on the Fifth Circuit's tendency toward liberality when analyzing the adequacy of motions for judgment as a matter of law, Dow Jones contends that its motions were sufficient to preserve the argument that there was no evidence to support a judgment for punitive damages against Dow Jones as a principal based on the conduct of

employees who were not managers or managing agents. *See Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.,* 81 F.3d 606, 610 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 182, 136 L.Ed.2d 121 (1996); *MacArthur v. University of Texas Health Ctr. at Tyler,* 45 F.3d 890, 896–97 (5th Cir. 1995); *Charbonnet v. Lee,* 951 F.2d 638, 643 (5th Cir.), *cert. denied,* 505 U.S. 1205, 112 S.Ct. 2994, 120 L.Ed.2d 871 (1992); *Miller v. Rowan Cos., Inc.,* 815 F.2d 1021, 1024 n. 4 (5th Cir.1987), (stating that "this Circuit and others have rejected the rigid application of Rule 50(b) in favor of a more liberal approach," and citing numerous cases) This Court finds that Defendants have not waived the point.

The evidence is that Dow Jones, among other enterprises, owns and publishes *The Wall Street Journal.* When the Article was published Defendant Jereski was a relatively new employee at the *Journal.* Ms. Jereski graduated from Harvard University in 1983. Between 1985 and 1993, she had jobs at *Forbes* magazine as a reporter and later as an associate editor, and at *Business Week,* where she was a correspondent on business and financial stories. She joined the *Journal* in March, 1993, about seven months before the Article was published. During this seven-months period she wrote more than 30 by-lined articles which were published in the *Journal;* a number of these articles reported on aspects of the bond business. A newly-hired reporter for the newspaper that has the largest readership in America, Ms. Jereski plainly was not employed by Dow Jones in a managerial capacity, or as a managing agent, and there is no evidence that she had authority to direct or to approve the publication of anything in the *Journal.*

■ Plaintiff argues, however, that Ms. Jereski was an unfit journalist and that Dow Jones should have known it and was reckless in continuing to employ her on this Article; hence, Dow Jones should be held liable for punitive damages. Whether there was sufficient evidence from which a jury could so find is analyzed under the rule of *Boeing Co. v. Shipman,* not under the heightened standard of clear and convincing evidence that applies to Constitutional malice. Plaintiff re-

lies primarily on evidence that Ms. Jereski had had no formal education in journalism and Plaintiff argues that Ms. Jereski's eight years of previous journalistic experience with business magazines did not prepare her for work at a business newspaper such as the *Journal.* There is no evidence, however, that Dow Jones had received any complaints about the accuracy and·content of Ms. Jereski's numerous previously published stories. Moreover, the record contains substantial evidence that neither a college journalism class nor a degree in journalism is required for one to work successfully as a journalist. Given Ms. Jereski's formal education and her years of satisfactory performance as a business journalist, Plaintiff's argument that Dow Jones should be adjudged liable for punitive damages for Ms. Jereski's actual malice, based on the *Journal's*˙recklessness in employing or retaining Ms. Jereski as a journalist, is not supported by so much as a scintilla of evidence.

 Plaintiff also argues that Dow Jones ratified Ms. Jereski's libelous statements, and thus may be held liable for punitive damages for her actual malice. First, MMAR contends that Dow Jones ratified Ms. Jereski's acts when Mr. Clements, the substitute editor, approved publication of the Article. As recounted above at pages 18–21, there is no evidence that Mr. Clements—assuming he was a managerial agent for this purpose—knowingly adopted or ratified for Dow Jones any malicious act of Ms. Jereski. Second, MMAR argues that Dow Jones ratified the libel after its publication, principally based upon the conduct and testimony of Mr. Calame, the *Journal's* deputy managing editor. As observed above, Mr. Calame had little if anything to do with the Article before its publication. At trial Mr. Calame defended the Article based upon his having read it and having reviewed at least some of the earlier drafts. Mr. Calame concluded from his limited survey that he thought "the essence and the thrust of this piece are right on," and that there "are no statements there that mislead the reader." Plaintiff argues that the foregoing testimony, given by Mr. Calame at the time of trial when he had "the fullest possible knowledge of Jereski's conduct," is sufficient from which to find that the˙

*Journal* ratified Ms. Jereski's libelous statements. This argument, however, must be considered in the context of the full record regarding Mr. Calame. Mr. Calame was not shown to have made any investigation of the underlying facts, much less of all of the evidentiary details. Moreover, Mr. Calame was not present during trial as a corporate representative and, with the rule having been invoked, he was excluded from the courtroom and required not to discuss his own or the testimony of others until after he had testified and had been excused from the rule. He did not "ratify" at trial the publication of any statement that the evidence showed that he knew or had reason to believe was false and defamatory. To the contrary, Mr. Calame emphasized the importance of accuracy, reliable information, and precision in reporting, and he otherwise generally and predictably defended his newspaper. In sum, Mr. Calame's testimony at trial, viewed as a whole and in a light most favorable to Plaintiff, is not evidence that is substantial and of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment could conclude that Mr. Calame, and hence Dow Jones, had ratified or approved the act of publishing false and defamatory statements about Plaintiff.

 Plaintiff also argues that actual malice can be attributed to Dow Jones because of its failure to repudiate Ms. Jereski's story or to retract the false statements. Plaintiff contends·that this inaction constituted ratification by Dow Jones of the libelous content. The "failure to retract" evidence centers on three letters that were sent to the *Journal* after the Article was published: (1) a "news release, for immediate release" from MMAR, dated October 21, 1993, addressed to the Managing Editor of the *Journal* and signed by MMAR's Chief Executive Officer, copied to the *Journal*'s lawyer and to Ms. Jereski (Plaintiff's Exhibit No. 56); (2) a letter dated October 28, 1993, addressed to the *Journal*'s Managing Editor, signed by Raymond James's William Robinson, copied to the *Journal*'s lawyer and to Ms. Jereski (Plaintiff's Exhibit No. 57); and (3) a letter from Robert Thomas Securities, Inc., dated November 1, 1993, addressed to Ms. Jereski and

signed by J. Stephen Putnam, President of the company. (Plaintiff's Exhibit No. 58). Each of these letters pointed out certain claimed errors of facts or emphases in the Article.

MMAR's letter from its chief executive officer, although addressed to the Journal's Managing Editor, is boldly marked "NEWS RELEASE," with the subcaption "For Immediate Release." It bears the markings not so much of a demand for a retraction (such words as "retraction" or "correction" are not used in the letter) as of a letter to the editor in the form of a press release, in which MMAR's CEO refuted two, and arguably three, of the five statements that the jury found were libelous. MMAR's chief executive officer closed the news release/letter by stating, "MMAR hopes and expects that the *Wall Street Journal* (and MMAR's clients) will recognize the real facts and the truth rather than accept the false statements, unfounded implications and malicious innuendos made by disgruntled former employees (or defendants in the fraud suit) and as reported by Ms. Jereski in what can only be described as a slanderous and 'muckraking fashion.'" The second letter, which was signed by Mr. Robinson, who was not an employee of MMAR, concluded with an expression of "trust that you and the *Wall Street Journal* will do whatever is necessary to make the appropriate corrections and advise Ms. Jereski accordingly." The third letter, from Mr. Putnam of Robert Thomas Securities, expressed Mr. Putnam's disturbance "by the implications in your article and the quotations of Bill Robinson a former department head of the taxable fixed income desk," but made no demand for any correction or retraction.

Even if the letters had contained clear demands for retractions of specific statements, "failure to retract upon [the plaintiff's] demand ... is ... not adequate evidence of malice for constitutional purposes." *New York Times,* 376 U.S. at 286, 84 S.Ct. at 729. Under certain circumstances, however, evidence of a refusal by a publisher to retract a statement after it has been demonstrated to him to be both false and defamatory might be relevant in showing recklessness at the

time the statement was published. *Golden Bear Distributing Sys. v. Chase Revel Inc.,* 708 F.2d 944, 950 (5th Cir.1983), *quoting* RESTATEMENT (SECOND) OF TORTS § 580A & cmt. d (1977). The letters and the fact that no retractions were made were admitted at trial, but such evidence in this case is insufficient to establish with convincing clarity the presence of constitutional malice on the part of Dow Jones. A decision not to retract, indeed, may just as well indicate that the publisher believed and still believes that the falsehood was true.

Moreover, apart from the elevated standard of proof required for proof of Constitutional malice, the Journal's failure to retract, considered together with evidence of other post-publication conduct by Dow Jones's employees, including their receipt of the three letters above described and the trial testimony of Mr. Calame, Ms. Miller, and Mr. Clements, in which each, in varying detail, persisted in defending the truth or substantial truth of what had been written, and with reasonable inferences drawn most favorable to MMAR, amount to no evidence from which reasonable persons could find that Dow Jones ratified the knowing publication of false and defamatory statements about MMAR. Moreover, the fact that Dow Jones's witnesses at the 1997 trial of this case defended the challenged statements as being true or substantially true based upon their beliefs that the main point of the statements, compared to the literal truth, would be no more damaging to the subject business than would be the literal truth, provides no evidence from which a reasonable jury could find that Dow Jones ratified the knowing publication of false and defamatory statements in the 1993 Article.

In sum, the facts and inferences point so strongly and overwhelmingly in favor of Defendant Dow Jones on the propositions (1) that neither Dow Jones nor a managerial agent of Dow Jones knowingly authorized Ms. Jereski to publish false and defamatory statements about MMAR; (2) that Ms. Jereski, was not unfit to work as a journalist and that Dow Jones was not reckless in employing or in retaining her as a journalist during the times material to this case; (3) that Ms.

Jereski was not herself employed in a managerial capacity, and (4) that neither Dow Jones nor any managerial agent of Dow Jones ever knowingly ratified or approved Ms. Jereski's writing of false and defamatory statements about MMAR, that reasonable persons could not arrive at a contrary verdict.

For the foregoing reasons, Dow Jones is entitled to judgment as a matter of law on Interrogatory Nos. 4(a) and 5(a), and to the entry of a take nothing judgment on MMAR's claim for punitive damages.

### Defendants' Alternative Motion for New Trial

The Court has carefully considered Defendants' Alternative Motion for New Trial (Document No. 101) in which, among other things, Dow Jones requests that the Court enter a conditional order of new trial or remittitur pursuant to FED. R. CIV. P. 50(c)(1) with respect to the punitive verdict against Dow Jones.

The Fifth Circuit has observed that the Supreme Court, in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 573–75, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996), held that the following factors must be considered in determining the reasonableness of a punitive damage award:

(1) The degree of reprehensibility of the defendants' conduct;

(2) The disparity between the harm suffered and the damage award; and

(3) The difference between the damages awarded in this case and comparable cases.

*Patterson v. PHP Healthcare Corp.*, 90 F.3d 927, 943 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997). The instant motion is analyzed with these factors in mind.

Also, under Texas law punitive damages are levied against a defendant to punish the defendant for outrageous, malicious, or otherwise morally culpable conduct. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 16–17 (Tex.1994).

> The legal justification for punitive damages is similar to that for criminal punishment, and like criminal punishment, punitive damages require appropriate substantive and procedural safeguards to minimize the risk of unjust punishment.
>
> * * * * * *
>
> Our duty in civil cases, then, like the duty of criminal courts, is to ensure that defendants who deserve to be punished in fact receive an appropriate level of punishment, while at the same time preventing punishment that is excessive or otherwise erroneous.

*Id.* at 16, 17 (footnotes omitted).

The Court has already discussed at some length the reasons for its conclusions that the punitive damages award against Dow Jones must be set aside as a matter of law. However, if on appeal this Court is reversed for so holding, and if Plaintiff should be entitled to entry of a judgment for recovery of punitive damages from Dow Jones, then this Court finds that the jury's award of $200 million is clearly and grossly excessive, and would constitute an unjust and extremely disproportionate punishment for the particular conduct that gives rise to the liability.

The Court has also considered whether the excessiveness of the $200 million verdict is *per se* the product of jury passion and prejudice, which would require a new trial on issues of liability. *See Auster Oil and Gas, Inc. v. Stream*, 835 F.2d 597, 603 (5th Cir.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988); *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir.1985) (the "better approach is to require a new trial on any issue infected by passion and prejudice and employ remittitur for those verdicts which are excessive, that is, so large as to be contrary to right reason."). The Court is satisfied and finds that the verdict was not the result of jury passion and prejudice. Compare, for example, the $20,000 punitive damages verdict against Ms. Jereski, a salaried reporter. Although $20,000 is a stiff punishment even for a well-compensated individual, it is also within the realm of the "doable," and reflects a dispassionate effort by the jury to set an appropriate punishment for Ms. Jereski's actual malice.

The Court is persuaded that the jury approached its punishment of Dow Jones with similar decent intentions. Undoubtedly, however, the jury here must have been overwhelmingly influenced by Dow Jones's $2 billion in annual revenues and $4.2 billion in market capitalization, only portions of which are attributable to its ownership and publication of the *Journal.* Jurors are always challenged by plaintiffs' attorneys to set punitive damage awards sufficiently high to "send a message" and to cause the tortfeasor's wrongful conduct to be noticed at the highest corporate levels. In this instance, however, the jury simply went too far and, it appears, blindly based its verdict solely in proportion to Dow Jones's balance sheet without also taking into consideration the actual damages sustained by MMAR and the relative degree of reprehensibility of Dow Jones's conduct.

The jury, of course, had no way to know or to compare the amounts of punitive damages awarded or approved in other comparable cases. In support of its motion, Dow Jones has submitted, among other things, that the $200 million punitive damages award returned by the jury against Dow Jones is:

- more than the total punitive damages affirmed in all cases of all kinds by the Texas state appellate courts during 1992, 1993, and 1994 combined. *See* Appendix D to Defendants' Post–Verdict Motion for Judgment As A Matter of Law ($186.68 million in 110 cases);

- nearly 100 times the largest punitive damage award ever affirmed by any federal Court of Appeals in a media libel case, *Brown & Williamson Tobacco Corp. v. Jacobson,* 827 F.2d 1119 (7th Cir.1987), cert. denied, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988) ($2.05 million), where the journalist defendant had falsely alleged that the plaintiff had engaged in a systematic campaign to entice children to smoke; more than 9 times the largest punitive damage award ever affirmed in a media libel case by any appellate court anywhere, *Sprague v. Walter,* 441 Pa.Super. 1, 656 A.2d 890 (1995) ($21.5 million), where the reporter had told his editor that his goal was to "get" the plaintiff, a personal enemy, the reporter had concededly altered notes and had a known history of alcoholism at the time; and

- 285 times larger than the largest punitive damage award ever affirmed by the Fifth Circuit in a libel case, *Brown v. Petrolite Corp.,* 965 F.2d 38 (5th Cir. 1992) ($700,000).

Plaintiff has not disputed the foregoing factual representations.

In sum, the Court finds that the jury's $200 million punitive damages award was wrongly—although dispassionately—reasoned; and the verdict in that amount is greatly excessive if, indeed, any punitive damages award against Dow Jones is allowed to stand. The magnitude of the award, and its clear excessiveness, therefore persuades this Court conditionally to grant Defendants' Motion for New Trial on the punitive damage claim unless Plaintiff should file an acceptance of remittitur in the amount of $155 million if this Court's judgment denying Plaintiff's punitive damages claim is vacated or reversed. Upon such condition, if Plaintiff MMAR fails timely to file an acceptance of remittitur to reduce the punitive damages award to $45 million, Defendant Dow Jones's Alternative Motion for New Trial, on the issue of punitive damages only, is GRANTED. In all other respects, Defendants' Alternative Motion for New Trial is DENIED.

## ORDER

For the reasons set forth above, it is

ORDERED that Defendants' Post–Verdict Motion for Judgment as a Matter of Law (Document No. 177) and Defendants' Motion for Judgment as a Matter of Law (Document No. 201) are GRANTED with respect to Plaintiff's claim for punitive damages against Defendant Dow Jones; and Defendants' Motions for Judgment as a Matter of Law are otherwise DENIED; it is further

ORDERED that Plaintiff's Motion for Entry of Judgment (Document No. 178), except for punitive damages against Defendant Dow Jones, is GRANTED, and Plaintiff's Motion to Alter and Amend Judgment (Document No. 203) is DENIED; and it is further

ORDERED that Defendant Dow Jones's Alternative Motion for New Trial (Document No. 201) is CONDITIONALLY GRANTED, only with regard to punitive damages against Dow Jones, as follows: if the Final Judgment of this Court is reversed or vacated with respect to Defendant Dow Jones's receiving a take nothing judgment as a matter of law on Plaintiff's claim for punitive damages and the jury's punitive damages award is upheld, then Defendant Dow Jones is GRANTED a new trial on the issue of punitive damages only, UNLESS Plaintiff files an acceptance of remittitur in the amount of $155 million within fourteen (14) days after the appellate judgment of reversal shall have become final and non-appealable.

The FINAL JUDGMENT entered May 27, 1997, remains unchanged.