

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-11-00074-CV

DENNIS L. MIGA                                                    APPELLANT

V.

RONALD L. JENSEN                                                 APPELLEE

----------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY

----------

AND

## NO. 02-11-00167-CV

IN RE DENNIS L. MIGA                                            RELATOR

----------

ORIGINAL PROCEEDING

----------

## MEMORANDUM OPINION[1]

----------

[1]*See* Tex. R. App. P. 47.4.

The dispute between these parties has spanned more than sixteen years.[2] The current appeal and petition for mandamus result from the trial court's 2011 postjudgment injunction enjoining Appellant/Relator Dennis L. Miga and his wife from spending, depleting, secreting, or transferring $21,560,150.67, plus prejudgment interest—except in the ordinary course of business or for reasonable and necessary household and living expenses or reasonable and necessary attorney's fees—until that amount is finally paid to Appellee/Real Party in Interest Ronald L. Jensen.

In his petition for writ of mandamus and appeal, which we consolidated, Miga complains that the trial court had no jurisdiction to enter the postjudgment injunction and, alternatively, that the trial court abused its discretion by doing so. Because we hold that the injunction is not appealable, we dismiss Miga's appeal. Because we hold that the trial court had jurisdiction to issue the injunction and did not abuse its discretion by doing so, we deny Miga's petition for writ of mandamus.

## I. Facts and Procedural History

### A. Miga's Suit

In January 1998, Miga obtained a trial court judgment against his former employer, Jensen, for about $18.8 million plus approximately $4.5 million in

---

[2]*See Miga v. Jensen*, 96 S.W.3d 207, 209 (Tex. 2002) (*Miga I*).

prejudgment interest.[3]  Jensen appealed.[4]  To end the accrual of postjudgment interest, the parties entered into an agreed order, signed by the trial court, under which Jensen tendered $23,439,532.78 to Miga toward satisfaction of the judgment.[5]  On appeal, the Supreme Court of Texas reduced Miga's judgment to $1,034,400; reinstated prejudgment interest at a rate of 10%; and also awarded postjudgment interest at a rate of 10% from the date of the trial court's judgment to the date the agreed order terminated the accrual of postjudgment interest.[6]  On remand, the trial court rendered a modified judgment for Miga of $1,879,382.11.[7]

## B.  Jensen's Suit

Jensen then sought restitution of the difference between the modified judgment and the amount he had already paid to Miga.[8]  Miga refused to repay Jensen the $21,560,150.67, so Jensen filed suit against Miga for restitution (Jensen's lawsuit).[9]

---

[3]*Id.* at 210.

[4]*Id.*

[5]*Id.*

[6]*Id.* at 217.

[7]*Miga v. Jensen*, 299 S.W.3d 98, 101 (Tex. 2009) (*Miga II*).

[8]*Id.*

[9]*Id.*

3

In February 2004, while Jensen's lawsuit was pending, the trial court entered a temporary injunction (the 2004 temporary injunction) prohibiting Miga and his wife from spending, dissipating, or otherwise moving $21,560,150.67, except in the ordinary course of business and reasonable and necessary living expenses. The trial court found in the 2004 temporary injunction that injunctive relief was necessary to preserve the status quo and that Miga had admitted that he no longer had the whole amount Jensen had paid him. The 2004 temporary injunction stated that it was effective "until judgment in this cause is rendered by this Court." On March 3, 2005, the trial court entered an order extending the 2004 temporary injunction, stating that it "shall survive the entry of final judgment by this Court and shall remain in effect until a final, non-appealable judgment is entered in this cause and all rights to appeal in this cause have been exhausted or expired."

The next day, the trial court signed an order granting summary judgment for Jensen. The trial court signed a final judgment in the cause on April 19, 2005, ordering that Jensen recover $21,560,150.67 plus prejudgment and postjudgment interest.[10] The judgment states that the March 3, 2005 order extending the 2004 temporary injunction "shall remain in force following the entry of this judgment in accordance with its terms."

---

[10]*Miga v. Jensen*, 214 S.W.3d 81, 84–85 (Tex. App.—Fort Worth 2006), *aff'd*, *Miga II* at 105.

On May 7, 2005, the trial court modified its judgment to dismiss without prejudice all claims asserted against Miga's wife pursuant to the parties' stipulation. Like the previous judgment, the modified judgment provides that the March 3, 2005 order extending the 2004 temporary injunction "shall remain in force following the entry of this [j]udgment in accordance with its terms."

This court affirmed the trial court's judgment, and the Supreme Court of Texas affirmed this court's judgment on October 23, 2009.[11] Miga filed a motion for rehearing in that court.

## C. Jensen's Recent Attempts to Enforce Judgment Against Miga

While Miga's motion for rehearing was pending, the parties' attorneys filed with the trial court a Rule 11 agreement (dated December 7, 2009) in which they agreed to extend the 2004 temporary injunction "for two weeks beyond the date on which that Order would otherwise expire by its terms," that is, two weeks beyond the date on which all rights to appeal had been exhausted or expired.

Then, on January 15, 2010, the Supreme Court of Texas issued mandate. Ten days later, Jensen filed with the trial court an application for a temporary restraining order, injunction, and expedited discovery. On January 27, 2010, after a hearing on Jensen's application, the parties filed with the trial court another Rule 11 agreement, this time agreeing to extend the 2004 temporary

---

[11]*Miga II* at 101, 105.

injunction "until the time the Court enters a replacement temporary restraining order or temporary injunction." In March 2010, Jensen deposed Miga.

On January 14, 2011, Miga filed a motion to declare the 2004 temporary injunction dissolved, asserting that (1) although the parties had filed the December 2009 and January 2010 Rule 11 agreements with the trial court, that court had never issued an order on the agreements and (2) he was withdrawing his consent to the entry of any agreed order by the trial court based upon the Rule 11 agreements. Miga asked the trial court to declare that the temporary injunction had dissolved by its own terms. Miga argued in his motion that the extension had been issued under civil practice and remedies code section 52.006 and rule of appellate procedure 24.2,[12] that the trial court's authority expired under those rules when the appeals were exhausted, that "[t]he attempt by the parties to confer on the Court by agreement additional authority after the determination of the appeal [was] improper and ineffective," and that "[t]he Court's authority under the statutes and rules during the pendency of the appeal [was] no longer applicable . . . ." He further argued that the trial court had no authority under section 31.002 of the civil practice and remedies code (the turnover statute) to enter an injunction prohibiting him from making expenditures.[13]

---

[12]*See* Tex. Civ. Prac. & Rem. Code Ann. § 52.006 (West 2008); Tex. R. App. P. 24.2.

[13]*See* Tex. Civ. Prac. & Rem. Code Ann. § 31.002 (West 2008).

6

On January 26, 2011, Jensen filed a combined emergency motion to enforce the Rule 11 agreement and application for temporary restraining order and injunction. Jensen argued that the Rule 11 agreement was valid and enforceable because it was in writing, signed by the parties, and filed with the trial court. He asserted that the trial court had jurisdiction "over this post-judgment collection action," including authority under sections 31.002 and 52.006(e) of the civil practice and remedies code.

The trial court held a hearing on February 14, 2011. The trial court concluded that a valid and enforceable Rule 11 agreement existed and that Miga had violated the agreement by secreting assets and concealing the existence and location of the assets. The trial court further concluded that it had the authority to enjoin Miga from secreting or further dissipating assets under the turnover statute. The trial court entered a turnover order, ordering Miga to turn over all assets in various accounts and to disclose to Jensen the location and account numbers of any other bank or account over which Miga or his wife had signature authority. Miga did not appeal or otherwise challenge the turnover order.

The trial court also entered a "temporary" injunction ordering Miga to "cease, desist and refrain from spending, dissipating, depleting, secreting, or otherwise moving, transferring, or burdening, other than in the ordinary course of business and/or for reasonable and necessary household and living expenses and/or reasonable and necessary legal fees" the amount of $21,560,150.67, plus

prejudgment and postjudgment interest. It is from this new injunction that Miga both appeals and seeks mandamus relief.

**D. Findings of Fact and Conclusions of Law**

The new injunction signed by the trial court contains the following findings and conclusions of law:

1. The mandate issued by the Texas Supreme Court on January 15, 2010 made this Court's Judgment final and non-appealable. The Judgment is now final, fully enforceable, and due to Jensen in full as follows:

(a) The principal amount of $21,560,150.67 together with pre-judgment interest thereon in the amount of $1,465,204.21, calculated at the rate of 5.50% simple interest from December 12, 2003, through March 8, 2005, plus $3,248.79 per day from March 8, 2005 until the day preceding the date of this judgment; plus

(b) Post-judgment interest, calculated at the judgment interest rate of 5.50% compounded annually on the unpaid balance from the date of judgment until Jensen is paid.

2. Miga has to date refused to pay the amount due on the Judgment in whole or in part, and testified that he has <u>no intention</u> of paying the Judgment.

3. In May 2004, in conjunction with Jensen's suit before this Court to recover the $21.5 million Miga owed him at that time, this Court entered a temporary injunction barring the Migas from "spending, dissipating, depleting, secreting, or otherwise moving, transferring, or burdening, other than in the ordinary course of business and/or for reasonable and necessary household and living expense, funds and assets in the amount of $21.560,150.67 . . . ."

4. In March 2005, the Court signed an order extending the temporary injunction, pursuant to the parties' agreement in return for Jensen's agreement to waive the requirement of a supersedeas bond, while Miga appealed this Court's grant of summary judgment

8

(the "Injunction"). The Injunction provided that it would automatically dissolve "upon entry of a final, non-appealable judgment in this cause and the exhaustion or expiration of all rights of appeal."

5. On December 7, 2009, after the Texas Supreme Court's decision denying Miga's appeal, but before the Court's denial of Miga's Motion for Rehearing and issuance of the Mandate, the parties filed a Rule 11 Agreement with the Court in which they agreed to extend the Injunction an additional two weeks beyond when it would otherwise expire.

6. The Texas Supreme Court denied Miga's Motion for Rehearing and issued its Mandate on January 15, 2010, thus making this Court's 2005 judgment (the "Judgment") final and non-appealable, and triggering the final two weeks of the Injunction.

7. Miga refused to extend the Injunction pending post-judgment collection proceedings, and Jensen filed an Application for Temporary Restraining Order and Injunction and Expedited Discovery with this Court on January 25, 2010.

8. After the hearing on Jensen's motion on Jan. 27, 2010, the parties filed a Rule 11 agreement (the "Agreement") with the Court extending the term of the Injunction "until the time the Court enters a replacement temporary restraining order or temporary injunction, whichever comes first."

9. The Agreement is in writing, signed by the attorneys for Jensen and for Mr. and Mrs. Miga, and was filed with the Court on Jan. 27, 2010. The Injunction states that "Either Party may seek modification or amendment of this Order at any time for good cause shown."

10. In March 2010, Miga testified that he had only about $340,000 in collectible assets left from Jensen's $23.4 million Payment and had no intention to pay the Judgment.

11. In an informal accounting in June 2003 captioned "Use of Rule 11 Agreement Funds," Miga represented to Jensen that he had $9.74 million remaining in "Cash and securities on hand," after paying $4.838 million in taxes, paying $1.49 million in attorney's fees, spending $2 million cash on a new house, incurring $2.5 million in losses on various investments, repaying a $1.8 million

9

business loan to a partner to his company Interfax, contributing $220,000 to section 529 educational plans for his sons, contributing $325,000 into an "Irrevocable Trust" for his sons, and incurring $550,000 in losses on municipal bonds.

12.    In his deposition in this proceeding in August 2004, Miga discussed the expenditures listed above in his schedule of the "Use of Rule 11 Agreement Funds," but refused to answer any questions about the location of the $9.74 million in "Cash and securities on hand" on the grounds that those questions invaded his constitutional right to privacy.  When Jensen moved to compel further disclosures, Miga also refused, on the same grounds.

13.    In Miga's March 2010 deposition, he testified that between March 13 and 19, 2003, within weeks after the *Miga I* mandate, he transferred $9.47 million in cash and securities to "RCR Foundation," a private "foundation" in Vaduz, Liechtenstein, under the administration of the Allgemeines Treuunternehmen ("ATU") and associated with VP Bank.  Specifically, Miga testified that:

a.    The assets were located in Liechtenstein.

b.    Miga had handwritten "RCR Foundation" on the JP Morgan Chase account statement next to the bank's reference to the transfers to "VP Bank."

c.    Miga funded RCR Foundation to benefit his children after his death, and that he understood it was akin to an irrevocable trust in the United States.

d.    Miga had no power to access the assets, to control what VP Bank did with the assets, or even to see a balance statement on value of the assets held by the Foundation other than on annual visits by a representative of ATU which ceased after 2008.

e.    Miga had never received any disbursement of funds from the Foundation.

f.    Because Miga had no control over the Foundation, he could not repatriate the assets for payment of the Judgment.

10

g.   Miga had no other bank, investment or other accounts outside the United States and had produced all records relating to such accounts.

14.   After his March 2010 deposition, Miga produced what purported to be an amendment to the by-laws of the RCR Foundation, signed by Dr. Guido Meier, and a "Letter of Wishes" expressing his desire that the assets of the Foundation be distributed to his two sons at the discretion of the directors after the deaths of Miga and his wife.

15.   The deposition of Miga's personal accountant established that Miga had not reported or paid taxes on what he claimed to have been a complete and final gift of almost $10 million to the RCR Foundation, nor had he filed the reports required for offshore trusts and bank accounts.

16.   After the March deposition, Miga also produced bank records that showed, among other things, transfers into his JP Morgan Chase bank account from various overseas banks, including VP Bank BVI, as well as transfers from an entity identified on the bank statements as "Bridgeport Group" to meet capital calls from JP Morgan.

17.   A search of public records in the British Virgin Islands disclosed that the Bridgeport Group, Inc. had been incorporated by ATU (BVI) Limited, the British Virgin Islands subsidiary of the Liechtenstein trust company affiliated with VP Bank, that ATU (BVI) remained the general agent of Bridgeport and that Bridgeport maintained its office at the same address as ATU [(]BVI).  Bridgeport Group was incorporated on March 6, 2003, three days after the Mandate in *Miga I*.

18.   At a continuation of his deposition in August 2010, after he produced additional documents, Miga refused to answer any questions on these subjects on the advice of his counsel, on the grounds that his answers would tend to incriminate him.

19.   On the morning of the August deposition, Miga disclosed for the first time the existence of a former account at First Curacao International Bank and produced for the first time a statement from that account showing transactions from July 1, 2005 through October 23, 2006.

11

20.     Miga testified that the First Curacao account was in his name individually, but that he used it exclusively to receive payments from customers of his business, Interfax, who were located in Syria, Iraq, and Iran and therefore were not able to send money directly into the United States because of restrictions on currency transfers following the September 11, 2001 attacks.

21.     Miga testified that although the funds received into the First Curacao account represented payments due to Interfax, Miga used them for personal purposes. Those purposes included making capital contributions for his account and those of a family trust to Interfax itself. Miga testified that he also accessed the funds directly through an ATM card that he could use in the United States.

22.     Miga testified that he never disclosed the First Curacao account or the income received into the account to his accountant who prepared his tax returns, or his Interfax business partner.

23.     Following the August deposition, Miga represented, through his litigation counsel . . . , that he might be willing to sign a letter requesting or instructing VP Bank, RCR Foundation or ATU to return the assets and all associated proceeds to enable Miga to pay a part of his debt to Jensen. However, on November 1, 2010, Miga's counsel communicated Miga's refusal to request repatriation of the assets on the grounds that it would jeopardize his negotiations with the IRS for tax amnesty. Miga refused to consent to allowing the IRS to discuss resolution of their potentially conflicting . . . claims to the assets in the Foundation.

24.     On November 15, 2010, [Miga's litigation counsel] informed [Jensen's litigation counsel] via email that Miga had sent a letter to ATU requesting that RCR Foundation provide Miga with copies of all documents referring or relating to the RCR Foundation and/or to the Miga family's participation therein. To date, Miga has represented through [his litigation counsel] that he has received no responsive documents.

25.     Based on Miga's testimony and other representations about RCR Foundation, Jensen retained counsel in Liechtenstein to obtain an injunction freezing the assets of the Foundation. The District Court of the Principality of Liechtenstein granted an injunction against Miga and the RCR Foundation c/o Allgemeines Treuunternehmen (General Trust Company) on December 7, 2010.

12

However, by letter dated December 14, 2010, Dr. Guido Meier, on behalf of the Foundation Council for the RCR Foundation, informed the Liechtenstein court that there are not now nor have there ever been any assets in the RCR Foundation.

26. On December 27, 2010, Miga produced a copy of a letter that had been sent by counsel representing Mr. and Mrs. Miga to the IRS in September in relation to a request for tax amnesty. In that letter, the Migas state that:

a. In 2003 they "transferred approximately $8.5 million in liquid assets and/or negotiable securities to VP Bank";

b. The assets they transferred came from Jensen's Payment;

c. The "primary account" disclosed "is located at VP Bank, which has headquarters in Liechtenstein. The (Migas') account is located at VP Bank in the British Virgin Islands ("BVI"), located at 3076 Sir Francis Drake's Highway, PO Box 3463 Road Town, Tortola, British Virgin Islands";

d. "The Taxpayers' (Migas') VP Bank account is held in the name of Bridgeport Group Inc.";

e. William Green, who is "believed to be a businessman and resident of BVI" is the sole director and officer of Bridgeport Group;

f. Bridgeport Group was formed by RCR Foundation, a foundation established by the Migas and domiciled in Vaduz, Liechtenstein;

g. The Migas estimate their total unreported income stemming from the account(s) to be between $0 and $100,000 for the years 2003 through 2008; and

h. During 2005 and 2006, the Migas also had an account with First Curacao International Bank "in order to have a debit card."

13

27.     Miga has not produced any account statements or other documents relating to the account of Bridgeport Group, Inc. with VP Bank (BVI) or any other foreign bank other than First Curacao International Bank.

28.     This Court has authority to enjoin Miga from secreting or further dissipating assets pursuant to the Turnover Statute, Civil Practice and Remedies Code § 31.002.  *In the Guardianship of De Villarreal*, 2009 Tex. App. LEXIS 2249, at *14 [2009 WL 888467, at *4] (Tex. App.—Corpus Christi 2009, pet. [denied]) . . . .

29.     To obtain injunctive relief in the pre-trial context, the applicant must plead and prove:  (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.  *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Emeritus Corp. v. Ofczarazak*, 198 S.W.3d 222, 226–27 (Tex. App.—San Antonio 2006, no pet.).  However, "the first two elements that must be established to obtain a pre-trial temporary injunction are necessarily met when a judgment has been rendered against a defendant.["] *Emeritus Corp.*, 198 S.W.3d at 227.

30.     The standard for injunctive relief to preserve assets after judgment is different than the "more general 'probable, imminent and irreparable injury' that is applicable in a variety of pre-trial contexts."  *Emeritus Corp.*, 198 S.W.3d at 227.  In the post-judgment context, the question is only "whether the judgment debtor is likely to dissipate or transfer its assets to avoid satisfaction of the judgment."  *Id.*  Evidence of the actual dissipation or transfer of assets is not necessary to meet this standard.  *Id.* at 228.

31.     In this case, the evidence is undisputed that Miga has transferred millions of dollars of money he received from Jensen to a secret offshore account and taken extensive actions to prevent its discovery, including falsely marking documents and deliberately and repeatedly giving false testimony under oath.

32.     The record therefore establishes that in the absence of injunctive relief, Miga is likely to dissipate or transfer his assets to avoid satisfaction of the judgment.

33.     The record further establishes that Jensen is in imminent and probable danger of being irreparably harmed if Miga is

14

not enjoined from spending, dissipating, depleting, secreting, or otherwise moving, transferring, or burdening the assets that remain available to satisfy the Judgment. The record establishes that Jensen is faced with the threat of imminent and irreparable harm in that any further depletion of Miga's assets could further reduce Jensen's recovery, with Miga claiming to be unable to make up such loss. Each day of delay increases the risk of additional irreparable harm to Jensen's entitlement to payment of the Judgment. Temporary relief is accordingly necessary to preserve the status quo. If the Court does not issue a temporary restraining order to preserve the status quo, the Judgment entered by the Court will be rendered ineffectual in that the Funds will no longer be available, in whole or in part, for collection.

34. Jensen has no adequate remedy at law for the threatened injury, because Miga has admitted that he no longer retains the full amount of the Judgment even now. Any further expenditure, loss, concealment, dissipation, burdening or other disposition of remaining funds would only further reduce Miga's capacity to make restitution and Jensen's ability to recover what is due to him. Given the magnitude of Miga's obligation, the total losses to Jensen from Miga's conduct could easily exceed Miga's financial worth so as to prevent adequate compensation to Jensen.

35. It clearly appears from these facts that unless Miga is immediately restrained from spending, dissipating, depleting, secreting, or otherwise moving, transferring, or burdening, other than in the ordinary course of business and/or for reasonable and necessary household and living expenses, funds and assets in the amount of $21,560,150.67, together with pre-judgment interest thereon in the amount of $1,465,204.21, calculated at the rate of 5.50% simple interest from December 12, 2003, through March 8, 2005; plus pre-judgment interest in the amount of $194,927.40 for the dates March 8, 2005 until May 6, 2005, the day preceding the date of judgment, calculated at the rate of $3,248.79 per day; plus post-judgment interest thereon calculated at the judgment interest rate of 5.50% compounded annually on the unpaid balance from May 7, 2005, the date of judgment, until Jensen is paid, representing the amount of Jensen's Payment less that amount awarded to Mr. Miga under the Second Modified Judgment on Remand in Cause No. 048-161505-95, he will commit the foregoing acts before Jensen has opportunity to collect the Judgment; and that, if commission of these acts is not restrained immediately, Jensen will suffer

15

irreparable injury because his ability to recover the Judgment will be compromised.

## II.  Our Jurisdiction

Miga asks us to treat his original petition for writ of mandamus and his subsequent brief on appeal and petition for writ of mandamus as one consolidated brief.  His issues can be divided into two main categories—those complaining that the trial court had no jurisdiction to enter the postjudgment injunction and those complaining that even if the trial court had jurisdiction, the trial court nevertheless abused its discretion by entering the injunction.

As Miga's decision to seek both appellate and mandamus relief shows, determining whether mandamus or appeal is the proper procedural vehicle for his complaints is tricky.  Caselaw provides that orders under the turnover statute are appealable because of their mandatory nature,[14] but this injunction is prohibitory in nature, not mandatory.[15]  Temporary injunctions are appealable interlocutory orders under section 51.014 of the civil practice and remedies code,[16] but this

---

[14]*Schultz v. Fifth Judicial Dist. Ct. of Appeals of Dallas*, 810 S.W.2d 738, 740 (Tex. 1991), *abrogated on other grounds by In re Sheshtawy*, 154 S.W.3d 114, 124–25 (Tex. 2004).

[15]*See Lifeguard Benefit Servs., Inc. v. Direct Med. Network Solutions*, *Inc.*, 308 S.W.3d 102, 112 (Tex. App.—Fort Worth 2010, no pet.) (explaining that a prohibitive injunction forbids conduct but a mandatory injunction requires it).

[16]Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (West 2008).

injunction, despite its label, is permanent, not temporary, in character.[17]  And while permanent injunctions issued with a final judgment are appealable,[18] an order enforcing a previously signed judgment generally is not a final judgment or decree and cannot be appealed as such.[19]  Because we believe that the challenged order is a permanent, prohibitory injunction designed to enforce the money judgment previously awarded Jensen, we hold that it is not an appealable order.[20]  We therefore dismiss Miga's appeal and address his issues brought via his petition for writ of mandamus and subsequent brief.

## III. The Trial Court's Jurisdiction

Miga contends that the trial court had no jurisdiction under the turnover statute or other law to enter the injunction.  But a trial court has the inherent power to enforce its judgments.[21]  "That power is part of the court's jurisdiction,

---

[17]*See Del Valle Indep. Sch. Dist. v. Lopez*, 845 S.W.2d 808, 809 (Tex. 1992); *cf. Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 335–38 (Tex. 2000) (treating order as temporary injunction rather than permanent injunction because it restrained Qwest immediately and while suit was pending).

[18]*See, e.g., Operation Rescue-Nat'l v. Planned Parenthood of Houston and Se. Tex., Inc.*, 975 S.W.2d 546, 567–70 (Tex. 1998) (affirming judgment and permanent injunction as modified).

[19]*Schultz*, 810 S.W.2d at 740.

[20]To foster judicial economy, we note that should the Supreme Court of Texas ultimately determine that Miga's issues are in fact appealable, we would alternatively overrule his appellate issues for the reasons provided herein and dismiss his petition for mandamus relief.

[21]*Arndt v. Farris*, 633 S.W.2d 497, 499 (Tex. 1982); *see* Tex. Gov't Code Ann. § 21.001(a) (West 2004); Tex. R. Civ. P. 308.

17

and the court may employ suitable methods to enforce its jurisdiction."[22]  "This authority to enforce is not extinguished by the mere passage of time or the finality of a judgment."[23]  The only limitations on a trial court's power to enforce its own judgments is that any enforcement order must be consistent with the original judgment and must not materially change the judgment.[24]  An order that does materially change the judgment is void.[25]

The rules of procedure do not dilute the trial court's inherent power.  Rule 308 of the civil rules of procedure provides that a trial court shall cause its judgments to be executed.[26]  Rule 621 provides that they shall be enforced by execution or other appropriate process.[27]

---

[22]*Arndt*, 633 S.W.2d at 499.

[23]*In re Tarrant Cnty.*, No. 02-05-00274-CV, 2005 WL 3436582, at *4 (Tex. App.—Fort Worth Dec. 12, 2005, orig. proceeding) (mem. op.) (Livingston, J., dissenting) *(*citing Tex. R. Civ. P. 329b; *Wall Street Deli, Inc. v. Boston Old Colony Ins. Co.*, 110 S.W.3d 67, 69 (Tex. App.—Eastland 2003, no pet.); and *Reynolds v. Harrison*, 635 S.W.2d 845, 846 (Tex. App.—Tyler 1982, writ ref'd n.r.e.)).

[24]*Id. at* *2, *5 (majority and dissenting ops.); *Matz v. Bennion*, 961 S.W.2d 445, 452 (Tex. App.—Houston [1st Dist.] 1997, writ denied).

[25]*In re Akin Gump Strauss Hauer & Feld, LLP*, 252 S.W.3d 480, 493 n.20 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding) (citing *Harris Cnty. Appraisal Dist. v. West*, 708 S.W.2d 893, 896–97 (Tex. App.—Houston [14th Dist.] 1986, no writ) (holding that trial court's enforcement order was void because it attempted to materially change the relief awarded in the trial court's judgment)).

[26]Tex. R. Civ. P. 308.

[27]Tex. R. Civ. P. 621.

The legislature has also not attempted to reduce the judicial branch's inherent power to enforce its own judgments. Section 31.002(a), the turnover statute, specifically provides that injunction is a tool for achieving such enforcement:

(a) A judgment creditor is entitled to aid from a court of appropriate jurisdiction *through injunction* or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that:

(1) cannot readily be attached or levied on by ordinary legal process; and

(2) is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.

(b) The court may:

(1) order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control, together with all documents or records related to the property, to a designated sheriff or constable for execution;

(2) otherwise apply the property to the satisfaction of the judgment; or

(3) appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment.

(c) The court may enforce the order by contempt proceedings or by other appropriate means in the event of refusal or disobedience.

(d) The judgment creditor may move for the court's assistance under this section in the same proceeding in which the judgment is rendered or in an independent proceeding.

(e) The judgment creditor is entitled to recover reasonable costs, including attorney's fees.

(f) A court may not enter or enforce an order under this section that requires the turnover of the proceeds of, or the disbursement of, property exempt under any statute, including Section 42.0021, Property Code. This subsection does not apply to the enforcement of a child support obligation or a judgment for past due child support.

. . . .

(h) A court may enter or enforce an order under this section that requires the turnover of nonexempt property without identifying in the order the specific property subject to turnover.[28]

Nowhere in the language of that statute does the legislature indicate an intent to eradicate the trial court's authority to enforce its judgments by restraining behavior rather than commanding other acts; we therefore reject Miga's argument that "[t]he turnover statute does not provide authority for the court to enter a purely prohibitive injunction against a Defendant to aid the judgment creditor in the collection of his judgment."

Miga also argues that the injunction impermissibly modifies the judgment by granting Jensen a security interest in all of Miga's assets, current or future, exempt or not. Miga cites with no discussion two El Paso cases for this proposition,[29] but we can see no correspondence between those cases and this

---

[28]Tex. Civ. Prac. & Rem. Code Ann. § 31.002 (emphasis added).

[29]*Moseley v. EMCO Mach. Works Co.*, 890 S.W.2d 529, 531 (Tex. App.—El Paso 1994, no writ); *Seibert v. Seibert*, 759 S.W.2d 768, 769 (Tex. App.—El Paso 1988, writ denied).

20

issue, and we decline to develop Miga's argument for him.[30]  Further, our review of the injunction here does not reveal any inconsistency between the judgment and the injunction, and the injunction does not change the judgment but is merely a vehicle for its enforcement.

Because we hold that the trial court had jurisdiction to enter the postjudgment injunction and that the injunction does not exceed that jurisdiction, we overrule all portions of Miga's issues contending otherwise.  Also, because the trial court did not rely on the existence of the prior written rule 11 agreement to acquire its jurisdiction to enforce its judgment, we overrule Miga's issues concerning that agreement as moot.

## IV.  No Abuse of Discretion by the Trial Court

In the remaining portions of his issues, Miga contends that the trial court abused its discretion by issuing the injunction because (A) it is not based on the evidentiary showing required by the turnover statute, (B) its use of terms "ordinary," "reasonable," and "necessary" makes it impermissibly vague, and (C) what a judgment debtor does with his property after the judgment is final and nonappealable "should not . . . be considered conduct that significantly interferes with the administration of a trial court's core functions," and holding otherwise

---

[30] *See Tello v. Bank One, N.A.*, 218 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (stating that "we know of no authority obligating us to become advocates for a particular litigant through performing [his] research and developing [his] argument for [him]").

21

would "open the flood gates for post-judgment actions by eager judgment creditors . . . ."

## A. Evidentiary Showing Under Turnover Statute

Miga argues that it is impossible for the evidence to make the requisite "showing that all of this unknown [future acquired] property cannot readily be attached or levied on by ordinary legal process and/or it is not exempt from attachment, execution[,] or seizure for the satisfaction of liabilities."  But that statutory showing required for a turnover order is not required for a postjudgment injunction.  As the trial court explained in its findings of fact and conclusions of law within the injunction, to obtain pretrial injunctive relief, an "applicant must plead and prove:  (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim."[31]  But those first two elements are necessarily established when judgment has already been rendered against a defendant.[32]  The requisites for obtaining postjudgment injunctive relief to preserve assets are different than the "more general 'probable, imminent and irreparable injury' that is applicable" pretrial.[33]  To justify a postjudgment injunction, an applicant must prove only that "the judgment debtor is likely to dissipate or transfer its assets to avoid

---

[31]*Butnaru*, 84 S.W.3d at 204; *Emeritus Corp.*, 198 S.W.3d at 226–27.

[32]*Emeritus Corp.*, 198 S.W.3d at 227.

[33]*Id.*

22

satisfaction of the judgment."[34] Evidence of the actual dissipation or transfer of assets is not necessary to meet this standard.[35] "The trial court abuses its discretion in ordering a post-judgment injunction if the only reasonable decision that could be drawn from the evidence is that the judgment debtor would not dissipate or transfer its assets."[36]

The trial court's unchallenged findings provide that

- Miga has refused to pay any part of the judgment and has testified that he has no intention of paying it;

- Miga has testified that he has only about $340,000 left from Jensen's $23.4 million payment;

- In an informal accounting in June 2003, Miga represented to Jensen that he had $9.74 million remaining in "Cash and securities on hand," after paying $4.838 million in taxes, paying $1.49 million in attorney's fees, spending $2 million cash on a new house, incurring $2.5 million in losses on various investments, repaying a $1.8 million business loan, contributing $220,000 to college funds for his sons, contributing $325,000 into an "Irrevocable Trust" for his sons, and incurring $550,000 in losses on municipal bonds;

- In an August 2004 deposition, Miga refused to answer any questions about the location of the $9.74 million in "Cash and securities on hand";

- In Miga's March 2010 deposition, he testified that within weeks after the *Miga I* mandate, he transferred $9.47 million in cash and securities to "RCR Foundation," a private "foundation" in Liechtenstein. Miga testified that he understood that the RCR Foundation was like an irrevocable trust in the United States; that he had no power to access the assets, to control what the bank did with the assets, or even to see

---

[34]*Id.*

[35]*Id.* at 228.

[36]*Id.* at 227.

a financial statement of the assets' value after 2008; and that he had never received any disbursement of funds from the Foundation;

- Miga testified that he had no other financial accounts outside the United States and had produced all records relating to such accounts;

- Later, Miga produced a document purporting to be an amendment to the Foundation's bylaws and a letter indicating his desire that the assets be distributed to his sons after he and his wife died, subject to the discretion of the Foundation directors;

- Miga's accountant's deposition established that Miga had neither reported nor paid gift taxes on the purported gift of almost $10 million to the Foundation, nor had he filed required reports for offshore trusts and bank accounts;

- After the March deposition, Miga also produced bank records that showed transfers into his JP Morgan Chase bank account from various overseas banks, including VP Bank BVI, as well as transfers from an entity identified on the bank statements as "Bridgeport Group" to meet capital calls from JP Morgan;

- A public record search revealed that on March 6, 2003, three days after the mandate in *Miga I*, the Bridgeport Group was incorporated by a subsidiary of the Liechtenstein trust company administering the RCR Foundation;

- In the continuation of his deposition in August 2010, Miga refused to answer any questions on these subjects on the advice of his counsel, on the grounds that his answers would tend to incriminate him;

- In August 2010, Miga admitted that he had also had an account at First Curacao International Bank, and he produced a statement from that account showing transactions from July 1, 2005, through October 23, 2006;

- Miga testified that the account was his individual account but that he used it exclusively to receive payments from customers of his business who were located in Syria, Iraq, and Iran and therefore prohibited from sending money directly into the United States because of restrictions on currency transfers following the September 11, 2001 attacks;

24

- Miga admitted that he used funds received into the account for personal purposes and that he accessed the funds directly in the United States through an ATM card;

- Miga testified that he never told his accountant or business partner about the account or the income received via the account;

- After the August 2010 deposition, Miga represented through his attorney that he might be willing to ask or instruct the Liechtenstein bank or trust company to return the Foundation assets and proceeds so that he could pay part of his debt to Jensen;

- On November 1, 2010, Miga's counsel communicated Miga's refusal to request repatriation of the assets on the grounds that it would jeopardize his negotiations with the IRS for tax amnesty. Miga refused to consent to allowing the IRS to discuss resolution of Jensen's and the IRS's potentially conflicting claims to the Foundation assets;

- On November 15, 2010, Miga's lawyer stated that Miga had sent a letter to the trust company asking that the foundation provide Miga with copies of all documents referring or relating to the RCR Foundation and/or to the Miga family's participation therein. As of the trial court's judgment, Miga claimed that he had received no documents;

- On December 7, 2010, Jensen obtained from a Liechtenstein court an injunction freezing the assets;

- A week later, Dr. Guido Meier, on behalf of the Foundation Council for the RCR Foundation, informed the Liechtenstein court in writing that there are not now nor have there ever been any assets in the RCR Foundation;

- On December 27, 2010, Miga produced a September 2010 letter to the IRS in which he and his wife stated that in 2003, they transferred about $8.5 million liquid assets or negotiable securities to the Liechtenstein bank, that the assets came from Jensen's payment, that their account is located at the bank's subsidiary in the British Virgin Islands, that the account is held in the name of Bridgeport Group Inc., that Bridgeport Group was formed by RCR Foundation, a foundation established by the Migas and domiciled in Liechtenstein, that the Migas estimate their total unreported income stemming from the account(s) to be between $0 and $100,000 for the years 2003 through 2008, and that the Migas had the

account with First Curacao International Bank "in order to have a debit card";

- The evidence is undisputed that Miga has transferred millions of dollars of money he received from Jensen to a secret offshore account and taken extensive actions to prevent its discovery, including falsely marking documents and deliberately and repeatedly giving false testimony under oath.

Accordingly, we reject Miga's argument and hold that Jensen has satisfied his evidentiary burden to obtain the injunction.

## B. Injunction Is Not Impermissibly Vague

Miga also argues that the order is impermissibly vague because it uses the terms "ordinary," "reasonable," and "necessary." Miga cites no specific authority for his proposition that these three common terms in legal and legislative drafting are vague. Jensen, on the other hand, does cite specific Texas authority for the proposition that "ordinary course of business" is sufficiently precise.[37] Further, as our sister court in Dallas has pointed out, courts routinely enforce provisions requiring a party to pay reasonable and necessary expenses.[38] We therefore reject Miga's argument that the injunction is vague and ambiguous because it uses the terms "ordinary," "reasonable," and "necessary."

---

[37] *See, e.g.*, *Metra United Escalante, L.P. v. Lynd Co.*, 158 S.W.3d 535, 545 (Tex. App.—San Antonio 2004, no pet.) (citing *Helpinstill v. Regions Bank*, 33 S.W.3d 401, 405 (Tex. App.—Texarkana 2000, pet. denied)).

[38] *Zidell v. Zidell*, No. 05-96-00052-CV, 1997 WL 424429, at *7 & n.13 (Tex. App.—Dallas July 30, 1997, no writ) (not designated for publication) (citing *Robbins v. Robbins*, 601 S.W.2d 90, 93 (Tex. App.—Houston [1st Dist.] 1980, no writ)).

### C. Miga's Policy Argument

Finally, Miga argues that what a judgment debtor does with his property after mandate has issued does not significantly interfere with the administration of a trial court's core functions and that upholding an injunction restricting the expenditures of the debtor until the judgment is paid would encourage hordes of creditors to seek postjudgment injunctive relief. Miga ignores the fact that injunctions are fact-specific and ignores the many unchallenged findings of fact included in the injunction itself.

Generally, a permanent injunction "must not grant relief which is not prayed for nor be more comprehensive or restrictive than justified by the pleadings, the evidence, and the usages of equity."[39] Here, Jensen requested the relief awarded. Further, the unchallenged findings of fact show that Miga has consistently flaunted the trial court's orders, wasting judicial resources at all levels. Finally, the permanent injunction allows Miga to continue to spend money in the ordinary course of business, for reasonable and necessary household and living expenses, and for reasonable and necessary attorney's fees; the injunction is therefore not overly broad but equitably precise.[40] We consequently reject Miga's remaining argument contending that the trial court abused its discretion,

---

[39]*Holubec v. Brandenberger*, 111 S.W.3d 32, 39 (Tex. 2003) (citing 6 L. Hamilton Lowe, *Texas Practice: Remedies* § 244 at 237 (2d ed. 1973)).

[40]*See Villalobos v. Holguin*, 146 Tex. 474, 208 S.W.2d 871, 875 (1948); *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992).

27

and we overrule all issues contending that the trial court abused its discretion by issuing the permanent injunction against him.

## V.  Conclusion

Having held that this injunction is not appealable, we dismiss Miga's appeal.  Having held that the trial court had jurisdiction to issue this permanent injunction enjoining Miga from spending money except in the ordinary course of business, for reasonable and necessary household and living expenses, and for reasonable and necessary attorney's fees and that the trial court did not abuse its discretion by issuing the injunction, we deny all mandamus relief.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MEIER, JJ.

DELIVERED:  March 8, 2012